## BURK BROS. v. NATIONAL LABOR RELATIONS BOARD.

No. 7412.

Circuit Court of Appeals, Third Circuit.

Feb. 3, 1941.

CLARK, Circuit Judge, dissenting in part.

Walter T. Fahy, of Philadelphia, Pa., for petitioner.

William F. Guffey, Jr., of Washington, D. C. (Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, Asst. Gen. Counsel, Samuel Edes, and Ramey Donovan, all of Washington, D. C., Attys., National Labor Relations Board, on the brief), for respondent.

Before BIGGS, MARIS, and CLARK, Circuit Judges.

MARIS, Circuit Judge.

Burk Brothers, a corporation engaged in the tanning and sale of leather in Philadelphia, has petitioned for the review of an order entered by the National Labor Relations Board against it. The Board in its answer requests the enforcement of its order. The Board found that the petitioner was engaged in interstate commerce, that it had interfered with, restrained and coerced its employees in the exercise of their right to join a labor organization, the National Leather Workers' Association, and that it had discharged four employees, Joseph Zalot, Kosta Kula, Charles Majer-

ick and Frank Majerick because of their union membership and activity. The Board ordered the petitioner to cease and desist from its unfair labor practices, to offer reinstatement to Charles and Frank Majerick and to give back pay to them and to Zalot and Kula, whom it had previously reinstated.

The interstate character of the petitioner's business was clearly shown by the evidence and is not disputed here. Likewise there was sufficient evidence to support the Board's finding that the petitioner, through certain of its foremen, by threats of lay-off and other actions, had restrained some of its employees from joining the union and coerced others into withdrawing from it. The evidence shows that in June or July 1937 approximately 125 of petitioner's 285 employees had joined the union but that by December, 1938, when the Board's trial examiner held his hearing, its membership had fallen to about seven. The Board was entitled to infer that this came about, at least to some extent, as a result of the activities of petitioner's foremen which the evidence disclosed.

We also think that there was substantial evidence to support the Board's finding that Zalot, Kula and Charles and Frank Majerick were laid off because of their union membership and activities. The evidence discloses that these four employees were leading figures in the union activity at the petitioner's plant. While of course this fact in itself is no bar to the discharge of an employee for legitimate reasons, it may well disclose the real motive actuating an anti-union employer in discharging such an employee when the reasons given for the action do not ring true.

Zalot was first employed in 1926 and had been continuously employed since June 1935 at the time of his discharge on June 28, 1937. He had been warned by his father, an assistant foreman, to stop talking about the union or he would be discharged. Shortly before the discharge his father let it be known that Zalot would be laid off "on account of talking too much about the C. I. O. in the place." The petitioner contends that he was merely laid off in his turn for lack of work. It appears, however, that he was paid off at the time his services were dispensed with, as was customary only in cases of discharge, rather than at the next succeeding pay day when employees who were laid off were ordinarily paid. It also appears that he had seniority over a number of employees who were retained. The petitioner's further contention that Zalot was an unsatisfactory worker is hardly convincing in the light of his foreman's admission that he had not done anything to warrant dismissal in the last two years of continuous service.

Kula was first employed in 1915 and, except for occasional lay-offs due to seasonal fluctuations, continued in the petitioner's employ until his discharge on December 14, 1937. At that time he had been employed without a break since November 5, 1935. He testified that when he was discharged his foreman told him: "I didn't lay you off; * * * the office is laying you off on account of the Union." In his case also it is contended that he was laid off in accordance with his seniority because of lack of work and that he was not discharged. Here again, however, it appeared that he was paid off immediately rather than at the next pay day and there was evidence that he had seniority over Drobonik, a fellow employee who was retained.

Charles Majerick commenced work in February 1934 and with the exception of one lay-off in 1934 worked steadily until his discharge August 2, 1937. He was the union's most successful organizer. The petitioner seeks to justify his discharge on two grounds. The first is a quarrel with an assistant foreman, over an operation in the suede department, to which he had recently been transferred, which took place on June 22, 1937, and which was described by another employee who was present as a "verbal argument." Although Majerick used some disgusting profanity, it was testified that he did comply with the assistant foreman's directions. The testimony of Miller, Majerick's foreman, supports the conclusion that he did not regard the incident as important; although the superintendent told him to discharge Majerick he did not do so, but merely transferred him back to his old department. Miller stated categorically that Majerick was laid off solely for the second reason advanced by the petitioner, curtailment of work, and in order of his seniority. But the evidence indicates that he also was paid off at once— an indication of discharge rather than temporary lay-off—and that at least nine men junior to him were retained. This fact the

petitioner made no effort to refute by producing its employment records.

 Frank Majerick, the father of Charles Majerick, was employed by the petitioner from 1907 to 1911 and from 1928 until January 28, 1938, when he was discharged. It is contended that he was laid off because of curtailment of work and in accordance with seniority. But there was evidence that he had seniority over two retained employees, Miller and Mitas, and the attempt of the petitioner to controvert this evidence is far from convincing. The petitioner urges that the Board's trial examiner in his intermediate report found that Charles and Frank Majerick had not been discriminatorily discharged. But the National Labor Relations Act, 29 U.S.C.A. § 160 (c), imposes upon the Board itself the duty of making the findings of fact, which duty it may not delegate to a trial examiner. National Labor Relations Board v. Elkland Leather Co., 3 Cir., 114 F.2d 221, 225, certiorari denied 61 S.Ct. 170, 85 L. Ed. ——. Where, as here, there is substantial evidence to support the Board's findings we may not set them aside merely because the Board's view of the weight and credibility of the testimony differed from that of its trial examiner.

 Upon the facts found by the Board its order to cease and desist from its unfair labor practices, to offer Charles and Frank Majerick reinstatement, and to make them and Zalot and Kula whole for loss of pay, was clearly proper. Indeed, the petitioner does not contend otherwise. The Board's order directed the petitioner to post notices "stating that the respondent [the petitioner here] will cease and desist as provided in paragraphs 1(a) and (b) and will take the affirmative action set forth in paragraphs 2(a) and (b) of this Order; * * *" The Board now requests and

consents that our decree enforcing its order shall modify this provision, in accordance with its present practice, so as to require the petitioner to post notices "stating that it will not engage in the conduct from which it is ordered to cease and desist and that it will take the affirmative action set forth in paragraphs 2(a) and (b) of this Order; * * *" We think that the requested modification is proper and it will be made.

The order of the National Labor Relations Board is affirmed and a decree enforcing it with the modification requested by the Board will be entered.

CLARK, Circuit Judge (dissenting in part).

This dissenting opinion illustrates (perhaps) the judicial shrinking from the difficulties of fact review. It is much easier to abdicate than to analyze. The writer calls that to the attention of the numerous critics of the jury system,[1] a body charged with a duty of deciding in a few hours matters that trouble judges for a few months. To avoid that trouble, the judges speaking first for themselves and then through legislative bodies have adopted what might be described as a protective coloring. They have refused to interfere with, or as they gracefully put it, substitute their judgment for that of, the primary fact triers. This refusal cannot, of course, go too far in avoidance of responsibilities and so we note the introduction of such words as "clear", "convincing", and "substantial", on the one hand, and "slight" and "scintilla" on the other.[2]

This tendency is especially noteworthy when the fact finders are, in theory at least, technical experts. The Congress has so regarded the Interstate Commerce Commission,[3] the Federal Trade Commission,[4]

---

[1] Kepford Jr., Trial By Jury Is Not Obsolete, 1 The Lawyer, 9–11; Jackson, Jury Trial To-day, 6 Cambridge Law Journal 367–380.

[2] 7 Words and Phrases, Perm. Ed., p. 445 et seq., clear; 9 Words and Phrases, Perm. Ed., p. 618 et seq., convincing; 40 Words and Phrases, Perm. Ed., p. 492 et seq., substantial; 38 Words and Phrases, Perm. Ed., p. 334 et seq., scintilla; 9 Wigmore on Evidence, 3d Ed., § 2494, scintilla; cf. Holtzoff, New Federal Procedure and the Courts p. 132; Federal Rules of Civil Procedure and Proceedings of the American Bar Association In-

stitute p. 316, et seq., p. 383, et seq.; Federal Rules of Civil Procedure, Proceedings of Institutes published by the American Bar Association pp. 80–84, 127, 165, 287; Clark and Stone, Review of Findings of Fact, 4 University of Chicago Law Review 190.

[3] 49 U.S.C.A. § 11; Tollefson, Judicial Review of the Decisions of the Interstate Commerce Commission, 5 George Washington Law Review 503, 540.*

[4] 15 U.S.C.A. § 41; Hankin, Conclusiveness of The Federal Trade Commission's Findings of Facts, 23 Michigan Law Review 233; Morrison, Judicial Re-

the Board of Tax Appeals,[5] the United States Shipping Board,[6] the Federal Communications Commission,[7] and the Board (National Labor Relations) here below.[8] Mr. Justice Douglas, speaking for a unanimous Supreme Court, recently phrased the philosophy with his accustomed ability: " 'Not by accident, but in line with a general policy, Congress has deemed it wise to entrust the finding of facts to these specialized agencies. It is essential that courts regard this division of responsibility which Congress as a matter of policy has embodied in the very statute from which the Court of Appeals derived its jurisdiction to act.' Congress entrusted the Board, not the courts, with the power to draw inferences from the facts. * * * The Board, like other expert agencies dealing with specialized fields * * * has the function of appraising conflicting and circumstantial evidence, and the weight and credibility of testimony."

N.L.R.B. v. Link-Belt Company (N.L.R.B. v. Independent Union of Craftsmen), January 6, 1941, 61 S.Ct. 358, 365, 85 L.Ed. —.

Two writers and students of the same subject are not quite so confident. They say:

"And in the resolution of factual questions dependent in large degree upon sub-

tleties of motive and intent—such as whether an employee's discharge was really for inefficiency or for union activity. * * * —The Board must decide what final inference is to be drawn from the objective facts, and the court must determine whether there is sufficient evidence to support the inference. * * *

"Proper performance of the functions of review placed upon the courts in these connections requires an exercise of judgment peculiarly delicate and exacting. To the conclusion of the Board must be accorded that respect which is due the actions of an administrative body especially equipped for, and constantly occupied with, the solution of problems of industrial strife. Yet at some point this deference to administrative experience and expertness must stop short of the court's abdication of all independent judgment. In drawing the fine line between deference and abdication, the customary formulas that there must be substantial evidence to support the findings, that the discretion granted must not be abused, give some apparent comfort but very little real aid." Nathanson and Lyons, Judicial Review of the National Labor Relations Board, 33 Illinois Law Review, 749, 750-751.

The case at bar seems to the writer a reductio ad absurdum of the rule. The issue

view of the Facts Found by the Federal Trade Commission, 4 Tulane Law Review 638.*

[5] 26 U.S.C.A. Int.Rev.Code, § 1100; Helvering v. Kehoe, 309 U.S. 277, 60 S. Ct. 549, 84 L.Ed. 751; Brown, Judicial Review in Taxation, 27 Georgetown Law Journal 37.*

[6] 46 U.S.C.A. § 804; Swayne & Hoyt, Ltd., v. United States, 300 U.S. 297, 57 S.Ct. 478, 81 L.Ed. 659.*

[7] 47 U.S.C.A. § 151; Rochester Telephone Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147.*

[8] 29 U.S.C.A. § 153; Ward, Proof of "Discrimination" Under the National Labor Relations Act, 7 George Washington Law Review 797; Finality of Fact Under Section 10(e) of the National Labor Relations Act, 25 Virginia Law Review 368; National Labor Relations Board: Substantial Evidence: Discrimination as to Tenure of Employment, 25 Cornell Law Quarterly 465; Power of the National Labor Relations Board to Order Reinstatement of Company Unions, 36 Michigan Law Review 1131 et seq.; "Substantial" Evidence to Support the Fact Find-

ings of the National Labor Relations Board, 37 Michigan Law Review 665; Judicial Review of Orders of the National Labor Relations Board, 87 University of Pennsylvania Law Review 716.*

* Compare generally: Dickinson, Administrative Justice and the Supremacy of the Law, pp. 39–76, 248–250; Judicial Test of Sufficiency of Evidence as Applied to Administrative Process, 8 George Washington Law Review 108; Conclusiveness of Findings of Fact by Federal Commissions, 5 University of Chicago Law Review 495; Warren, An Approach to the Extent of Judicial Supervision Over Administrative Agencies, 28 Georgetown Law Journal 1042; Judicial Review of Administrative Action by Federal Supreme Court, 35 Harvard Law Review 127, 134; Discussion of Current Developments in Administrative Law, 47 Yale Law Journal 515–674; Administrative Law—Scope of Judicial Review—Doctrine of the Ben Avon Case—Independent Determination by Court of Both Law and Facts Where Confiscation Question Involved, 39 Michigan Law Review 438 (comment).

is the common one of discriminatory discharge.[9] The Board's trial examiner, who by definition, saw and heard the witnesses, recommended the reinstatement of two employees and refused to so recommend as to two others. A year later, the Board, which equally by definition did not see and hear the witnesses, reversed their own examiner in part. It is true that the statute seems to justify such a plain disregard of the demeanor rule.[10] It makes the findings those of the Board.[11] The courts have, however, as we have seen, qualified the legislative "evidence".[12]

The writer agrees with the trial examiner's interpretation of the evidence and is glad to record the belief that the examiner is that "honest mind dispassionately probing into the facts" whom evidence must convince if it is to be found substantial.[13] Let him speak for himself.

*As to Majerick, Jr.*

"21. *Charles Majerick.* Majerick Jr. was first employed by respondent from February 2, 1934, until in or about May or June, when he was laid off. He returned to work in December 1934 and worked continuously as a burnisher under Foreman Miller, except for a few days when he was employed in the suede department, until the date of his discharge. He joined the Union in June 1937 and was the most active of all members of respondent company who joined the Union. He signed up or took the applications for union membership of between 37 to 45 of such employees.

"22. The record shows that during the summer of 1937 the business of respondent fell off to a considerable extent and in an effort to continue the volume of business respondent added a new line to its plant known as the suede department. The suede department was under the jurisdiction of Max Lehman, an assistant foreman of respondent, who took his orders from Henry Fitzpatrick, respondent's general superintendent. The record further shows that Majerick, Jr. refused to follow the reasonable instructions of Lehman in connection with his work in the suede department, and

on an occasion that occurred within a day or two after he had been transferred to the suede department he was requested to change certain paper on his machine. This he refused to do and called Lehman certain vile and unprintable names. At Lehman's request to Foreman Miller, Majerick. Jr. was returned to the burnishing department. The record shows that Henry Fitzpatrick, then general superintendent, upon learning of the Majerick, Jr.-Lehman episode, directed Miller to discharge Majerick, Jr. immediately.

"23. The record further shows that Miller did not immediately dispense with the services of Majerick, Jr., but permitted him to remain in the burnishing department until some 3 or 4 weeks subsequently, and to a time when Miller knew that, owing to reduced production, it would be necessary to make a general layoff in his department. Miller testified that the reason he did not follow the instructions of the superintendent, Henry Fitzpatrick, at the time and discharge Majerick, Jr. forthwith was because of the regard he, Miller, had for Majerick, Jr.'s father, Frank Majerick.

\* \* \* \* \*

"28. It is the opinion of the undersigned that but for the altercation had between Majerick, Jr. and Lehman, the record would be sufficient to support a finding that Majerick, Jr. was laid off and discharged because of his union activities; but in view of the Majerick, Jr.-Lehman episode, it is the opinion of the undersigned, and it is hereby found, that the evidence does not sustain the allegations that the respondent discriminated against Charles Majerick in regard to his hire and tenure of employment and that the complaint as to him should be dismissed." Extracts from Intermediate Report, Appendix to Appellant's brief, pp. 26-27, 30.

*As to Majerick, Sr.*

"29. *Frank Majerick.* Majerick (also known as Frank Mayerick, hereinafter referred to as Majerick, Sr.) was first employed by respondent in 1907 as a sorter and worked until 1911 when he left the respond-

9 Ward, "Discrimination" Under the National Labor Relations Act, 48 Yale Law Journal 1152.

10 Blume, Review of Facts in Non-Jury Cases, Proposed Federal Rule 68, 20 Journal of the American Judicature Society 68.

11 Sections 10(b) and 10(c) of the National Labor Relations Act, 29 U.S.C.A. § 160(b) and § 160(c).

12 Cf. Section 10(e) of the National Labor Relations Act, 29 U.S.C.A. § 160(e).

13 Gellhorn and Linfield, Politics and Labor Relations: An Appraisal of Criticisms of N.L.R.B. Procedure, 39 Columbia Law Review, 339, 366-377 at 376.

ent's employment. His next employment with respondent began in 1928. He joined the Union in 1937, and during at least 4 months of the time from June 1937 to January 27, 1938, he wore a C. I. O. button on his cap and shirt or coat. \* \* \*

"30. President Fitzpatrick testified that respondent recognized the rule of seniority. Majerick, Sr. claimed seniority over one Mitas. The record shows that Mitas worked for respondent from 1910 to 1917 and was out of such employment from 1917 until 1919 as a result of war service. He returned to work for respondent and worked from 1919 until 1933, when he again left the service of respondent, returning on March 22, 1937, and has been steadily employed since except when absent due to illness. The record shows that his seniority rights were restored in 1919 upon his return from such war service. Mitas has a total service with respondent of 24 years with the last continuous service dating from March 1937. Majerick, Sr. has a total service of 14 years with the last continuous service dating from 1928. Miller testified that he did not consider Mitas had lost his rights of seniority since he had granted him a leave of absence owing to shortage of production at the time he last left respondent's employment.

"31. John Miller, a son of Foreman Miller, entered the employment of respondent December 17, 1934, and has been continuously employed as a glazer and a sorter since that date. He receives less pay than a journeyman glazer and it appears that he performs some duties other than that of a glazer. It further appears that Majerick, Sr. actually had seniority over Miller, Jr. and was capable of performing all of the duties performed by Miller, Jr. It appears that President Fitzpatrick did not know of Miller, Jr.'s employment at the time of Majerick, Sr.'s lay-off.

"32. Miller, Sr. testified that he was training his son in the tanning business for the future with the view that the latter would eventually succeed to the former's position. It appears, and the undersigned hereby finds, that under the rules of seniority recognized in respondent's plant, that Miller, Jr. should have been discharged because of reduced production in the plant, instead of Majerick, Sr. It further appears, however, and the undersigned finds, that Miller did not lay off Majerick, Sr. because of the latter's union activities, but did lay him off in order that his son might retain his position and that while such action on the part of Miller, Sr. was highly unfair to Majerick, it is not and was not an unfair labor practice under the Act." Extracts from Intermediate Report, Appendix to Appellant's brief, pp. 30-32.

### As to Majerick, Jr.

The findings indicate an inefficient and quarrelsome employee whose resentment at criticism took the not unusual form of abuse of his detractors. He freely employed the four letter words stale in Elizabeth's time but pleasantly startling in ours.[14] That same energy may have enhanced his value as a Union organizer. The Board's refutation of their employee leaves them, in the writer's opinion, with the insufficient scintilla only. It is based on payment before pay-day and a retention of junior employees. The fallacy here lies in a penalizing of consideration. The discharge was not abrupt and at the time of a personal dissatisfaction. It was postponed and at the time of a general slackening.

### As to Majerick, Sr.

The Board's argument here seems even more tenuous. Their contention is again one of seniority over retained employees. One of these was the foreman's son and the Board finally appears to have abandoned its naivete. The other was only technically junior and its assertion is not entirely creditable. He had been employed for ten years longer than Mitas and his loss of seniority, if any, was due to the interruption of overseas service and a subsequent illness due thereto. Moreover, Majerick, a glazer, has been offered employment as a laborer and no glazers have been hired since his departure.

In conclusion, the writer is left with an uncertain feeling about the actual ratio decidendi. The two men sub judice were beyond dispute interested in and active for the Union. The respondent company displayed an anti-Union bias which both the law and this writer condemn. One man was an undesirable employee and the other the victim of economic conditions. We have, then, a choice of ascribable motives.[15] Is the inference drawn by the Board the improper one? If it is, the law has altered

---

[14] Ernst, The Censor Marches On.

[15] Weir v. Commissioner, 3 Cir., 109 F. 2d 996.

its traditional optimistic estimate of human nature.[16]

N.B.—In a law review note published after the filing of this opinion, the following appears: " * * * However, a disagreement between the Board and the trial examiner may indicate that a conclusion contrary to that of the Board is at least a reasonable one and may, therefore, properly be treated by the courts not as a factor to be weighed with the evidence, but as an indication that the evidence deserves closer examination. See International Ass'n of Machinists v. N. L. R. B. [1939, 71 App.D.C. 175], 110 F.(2d) 29, 34." Administrative Law—Judicial Review—Conclusion of Trial Examiner Contrary to That of Board Held to Detract Materially From Evidence Supporting Board's Finding, 54 Harvard Law Review 687, 689 (note).

[16] Cf. presumption in favor of innocence and against fraud.