### NORTH CAROLINA FINISHING CO. v. NATIONAL LABOR RELATIONS BOARD.
### No. 5005.

Circuit Court of Appeals, Fourth Circuit.

Feb. 17, 1943.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

Walter H. Woodson, of Salisbury, N. C. (H. Nelson Woodson and Walter H. Woodson, Jr., both of Salisbury, N. C., on the brief), for petitioner.

Earle K. Shawe, Regional Atty., National Labor Relations Board, of Baltimore, Md. (Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, and Louis Libbin and Millard Cass, Attys., National Labor Relations Board, all of Washington, D. C., on the brief) for respondent.

DOBIE, Circuit Judge.

This case is before the Court upon petition of the North Carolina Finishing Company (hereinafter called the Company), to review and set aside an order issued against it by the National Labor Relations Board (hereinafter called the Board). The Board, in its decision and order, found that the Company had violated Sections 8(1) and 8(3) of the National Labor Relations Act, 29 U.S.C.A. § 158(1, 3), by discriminatorily discharging Annie Mae Evington because of her activity in behalf of, and membership in, the Textile Workers Union of America (hereinafter called the Union), and by various anti-union conduct on the part of two Company supervisors, Clarence Boston and Ed Walser, who questioned employees concerning their Union affiliation, made disparaging remarks about the Union, and openly expressed their hostility and opposition to the Union.

The Board issued the usual order directing the Company to cease and desist from these unfair labor practices, to offer reinstatement with back pay to Annie Mae Evington, and to post appropriate notices. Two questions are now presented for our consideration: (1) are the Board's findings of fact that the Company has violated Sections 8(1) and 8(3) of the Act supported by substantial evidence, and (2) is the Board's order valid and proper under the Act.

The Company is a North Carolina corporation engaged in the sizing, bleaching and dyeing of cloth near Salisbury, North Carolina. In May, 1941, the Union started a campaign to organize the employees of the Company's plant. When the management of the Company became aware of the Union's activities, W. F. Robertson, Jr., Vice-President and General Manager, called a meeting of the overseers of the plant on July 28, 1941, and "told them of the attempts being made to organize the employees, instructed them not to interfere with the employees' right to self-organization * * * and instructed the overseers to pass this information along to the second hands." The term "second hands", refers to supervisory employees who rank immediately below the overseers.

On the very afternoon of the day Robertson called the meeting, Clarence Boston, a second hand in charge of the tender frame department, told one of his subordinates that "Mr. Robertson said he hoped the boys would forget about the Union now and not pay someone to dictate to them."

Then a few days later, second hand Walser (who had charge of approximately 150 employees in the sewing room) stated to a group of 10 or 12 of his subordinates, "Your union is nothing but run by a bunch of Germans to make you go out on strike for 2 or 3 weeks to hamper defense work." Walser also asked them why they could not bargain for themselves instead of using the Union as an intermediary bargaining agent.

After the formal organization of the Union (of which event the Company supervisors were admittedly aware) Walser told employee Messick that the Union would never get a closed shop in the Company. When Messick stated that the Company could not discharge an employee except for a good reason, Walser replied, "Ellen, don't get such stuff in your head. Don't you think the Company has sense enough to give a good reason?" Finally, throughout the month of August, 1941, Walser not only questioned numerous employees concerning their Union affiliations but he also made other disparaging remarks about the Union. We must note in all fairness however, that the Board expressly found that when a group of workers asked Walser, on one occasion, what Robertson thought of the Union, Walser replied: "Robertson has said he had always taken care of the workers and if they wanted to organize and join the Union and do so themselves to go ahead."

On the basis of the foregoing facts, the Board found that supervisors Boston and Walser had openly expressed opposition and hostility to the Union and that the Company had thereby violated Sections 8(1) and 8(3) of the Act. The Company now strenuously contends, however, that its management had officially taken an attitude of "no opposition" to the Union and that any statements to the contrary by supervising employees constituted private opinions only, since they were in direct conflict with the Company's policy of neutrality and with the Company's specific instructions.

Although the question is not free from doubt, we do not regard these anti-union statements of Boston and Walser as mere expressions of the personal views of the second hands. The remarks may have been unauthorized by the Company but we must remember that Robertson's instructions to the overseers were never directly communicated to the subordinate employees.

Accordingly, the hundreds of employees under the supervision of Boston and Walser could have reasonably believed that the second hands were speaking for the management, and this affords a sufficient basis for liability under the Act. International Association of Machinists v. N. L. R. B., 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50; Hickory Chair Mfg. Co. v. N. L. R. B. 131 F.2d 849, decided by this Court November 12, 1942; Virginia Ferry Corp. v. N. L. R. B., 4 Cir., 101 F.2d 103. We do not feel that the unenforced instructions of the Company issued by Robertson to the overseers that the employees were perfectly free to join the Union if they so desired, served to neutralize the normally coercive effects of the anti-union statements made by the second hands. Cf. H. J. Heinz Co. v. N. L. R. B., 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309; Solvay Process Co. v. N. L. R. B., 5 Cir., 117 F.2d 83, certiorari denied 313 U.S. 596, 61 S.Ct. 1121, 85 L.Ed. 1549; N. L. R. B. v. Chicago Apparatus Co., 7 Cir., 116 F.2d 753.

In H. J. Heinz Co. v. N. L. R. B., 110 F.2d 843, 847, affirmed 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309, the Sixth Circuit Court of Appeals stated: "There was no evidence that petitioner directed any supervisory employee to communicate its alleged neutrality to the employees. If petitioner had really wanted its employees to know that they might with safety join whichever union they desired, the bulletin boards were the obvious and, because direct, the most effective means of assuring them of its impartiality."

Undoubtedly the posting of notices on the bulletin board in the instant case would have more clearly shown the alleged impartial attitude of the Company towards its employees but it is impossible for us to state, on the basis of the facts before us, that the repeated statements of the supervisory employees had no effect upon the workers in exercising their free choice of bargaining representatives. Nor are we unaware of the principle announced by us in N. L. R. B. v. Mathieson Alkali Works, 4 Cir., 114 F.2d 796, 802, that: " * * * mere isolated expressions of minor supervisory employees, which appear to be nothing more than the utterance of individual views, not authorized by the employer and not of such a character or made under such circumstances as to justify the conclusion that they are an expression of

his policy, will not ordinarily justify a finding against him."

However, the facts of the instant case clearly do not fit within the corners of this doctrine.

The Company also makes the contention in its brief that no supervisors other than Boston and Walser engaged in conduct which might be deemed a violation of the Act. A careful examination of the entire record before us, though, reveals the fallacy of this assertion. For example, when the Union posted a notice on the plant bulletin board inviting the employees to attend the installation of the Union charter, second hand Adams (in charge of 4 departments) removed the notice and replaced it with a newspaper editorial entitled "A Menace to Labor." The gist of this clipping was a warning against "a projected labor monopoly" and a "few fat-salaried labor leaders (who) will rule this country as surely as Hitler rules his Reich." Another supervisory employee named Brinkley, whose official capacity is not altogether clear in the record, made sarcastic remarks about the Union and advised employees not to have anything to do with it.

It is true that the Board did not find that the conduct of Adams and Brinkley constituted an unfair labor practice. However, we feel that we may properly consider it at this time as a part of the "totality of the Company's activities" in order to determine whether the Act has been violated. N. L. R. B. v. Virginia & Electric Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348; Virginia Electric & Power Co. v. N. L. R. B., 132 F.2d 390, decided by us on December 9, 1942; N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L. Ed. 368; Stewart Die Casting Corp. v. N. L. R. B., 7 Cir., 114 F.2d 849, certiorari denied, 312 U.S. 680, 61 S.Ct. 449, 85 L.Ed. 1119.

Accordingly, without granting express approval to the conclusions reached by the Board, we are of the opinion that there is sufficient evidence in the record before us to warrant our affirming the Board to the effect that the Company has engaged in unfair labor practices within the meaning of Section 8(1) of the Act by interfering with the free exercise of the employees' right to self-organization and the right to bargain collectively through representatives of their own choosing.

We now turn to the alleged discriminatory discharge of Annie Mae Evington in violation of Sections 8(3) and 8(1)of the Act. This employee was hired by the Company in 1938 as an inspector and folder of sheets. Her duties were to detect and remove defective sheets which were known as "seconds" and "thirds". On August 1, 1941, she joined the Union and became the most active female employee in its behalf. She wore her Union button to work, served on various Union committees, attended the weekly Union meetings faithfully, and was the only girl bold enough to take the floor "to urge the women in her department to organize." Indeed, she was successful in "signing up" 12 girls as a result of her forceful Union activity. Then, on August 17, 1941, she was elected recording secretary of the Union, thereby becoming the only female employee to hold office in the Union. The Company's supervisory employees admittedly were aware of Evington's Union proclivities and Walser also learned from questioning other employees that she had solicited them for membership in the Union. Evington was finally discharged from the Company on September 25, 1941, by second hand Walser, at the request of overseer Grubb.

On the day of her discharge, Walser told Evington that the action was taken because "her percentage on her 'thirds' was higher than any of the other girls." In support of this contention, the Company introduced records at the Board's hearing, indicating the total number of "thirds" passed by each inspector in the sewing department. The individual records were as follows:

| Name | Thirds Passed | Days Worked |
|---|---|---|
| Mary Doby | 12 | 41 |
| Laura McBride | 11 | 69 |
| Annie Mae Evington | 11 | 46 |
| Frances Bailey | 10 | 64 |
| Ellen Messick | 10 | 59 |
| Hazel Correll | 10 | 72 |
| Rozelle Richard | 9 | 67 |
| Nancy Miller | 9 | 68 |

Walser admitted, however, that 2 of the 11 "thirds" charged against Evington were placed on the records subsequent to her discharge. An examination of these records on September 25, 1941, therefore, would have shown only 9 "thirds" listed against Evington. It is thus obvious that at the time of the discharge of Evington, at least 7 other inspectors had records worse than, or equally as bad as, hers (that is, based upon the actual number of "thirds"

passed without reference to the number of days worked). Yet Walser made the flat statement to Evington that she was being fired because she had the highest number of "thirds". Doby, a non-union employee who actually had the highest number of "thirds" was discharged by Grubb on September 26, 1941.

The Company now contends that Robertson had instructed Grubb to decrease the number of "thirds" even "if it is necessary to fire an employee", that Walser and Grubb had warned the inspectors as a group that some one would be laid off or discharged if the inspection did not improve, and that Evington and Doby were fired because they had the highest percentage of "thirds" according to the official tabulation which was made *after* the ensuing discharges. We shall discuss this explanation assigned by the Company in the light of the principle that union activity "in itself is no bar to the discharge of an employee for legitimate reasons [but], it may well disclose the real motive actuating an anti-union employer in discharging such an employee when the reasons given for the action do not ring true." Burk Bros. v. N. L. R. B., 3 Cir., 117 F.2d 686, 687.

At the outset, we wish to recall that Walser is on record as having stated that the Company would have "sense enough to give a good reason" for discharging a Union member. We think it is also significant that the Company's customary treatment of inspectors who had passed too many "thirds" was merely to discipline them by a 2 weeks' *lay-off,* whereas Evington was the first inspector ever to be *discharged* for this offense, and she had never been laid-off in the past.

Walser admitted that Doby was a poor worker, had been absent on many occasions without notifying the Company, and had also been laid-off once before for passing too many "thirds". It would therefore seem that the ensuing discharge of Doby was an afterthought on the part of the Company designed to conceal the prior discriminatory treatment of Evington. Moreover, we note erasures of the notations as to the number of days worked by Doby and Messick, and Walser was unable to explain this faulty state of the records.

Walser also testified that in a large number of cases he charged the inspectors with "thirds" without showing them the defective sheets or the records. Indeed, the last time Evington was shown the records there were only 5 "thirds" marked against her. Furthermore, about a month before Evington's dismissal Walser charged her with 2 "thirds" which had in fact been passed by another inspector. Finally, it appears that while the other inspectors were given individual warnings to improve their inspection, no such notice was given to Evington. And the keystone, we believe, to the entire situation is supplied by the fact that Evington was discharged a scant 10 days after Walser became aware of her election to the office of recording secretary of the Union.

The Company's attempted justification of Evington's discharge, in the light of the circumstances we have just outlined, seems to us quite unreasonable. Since the Company's position does not stand up under scrutiny, we must affirm the conclusion of the Board (which was also reached by the Trial Examiner) that Evington was discharged because of her known Union activities.

In holding that the discharge was illegally motivated, we are not unmindful of the legal tenet (as well as sound business practice) that the right to hire and fire is still a managerial function. N. L. R. B. v. Rock Hill Printing & Finishing Co., 4 Cir., 131 F.2d 171. But we are not moved by the reasons for the discharge assigned by the Company in the instant case. We realize that the present day employer is in a precarious position when he attempts to discipline a union employee. And the instant case is a border-line one, inasmuch as Doby, the discharged non-union employee, was given substantially the same treatment as Evington. Here again, however, as in the Company's violation of Section 8(1) of the Act, without granting express approval to the conclusions reached by the Board, we feel there is substantial evidence in the record to support the finding that Evington was discharged because of her Union activity.

Accordingly, we are of the opinion that the Board's findings of fact to the effect that the Company has violated Sections 8(1) and 8(3) are supported by substantial evidence, and that the Board's order, in the light of these findings, is valid under the Act and should be enforced as issued.

Affirmed and order enforced.