## NATIONAL LABOR RELATIONS BOARD v. TROJAN POWDER CO.

### No. 8189.

Circuit Court of Appeals, Third Circuit.
Argued Jan. 18, 1943.
Decided Apr. 6, 1943.

Marcel Mallet-Prevost, of Washington, D. C. (Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, and Ruth Weyand and Winthrop A. Johns, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

A. V. Cherbonnier, of New York City (Souser and Taylor and Kenneth Souser, all of Philadelphia, Pa., and Robert A. Lilly, of New York City, on the brief), for respondent.

Before MARIS and GOODRICH, Circuit Judges and GANEY, District Judge.

GOODRICH, Circuit Judge.

The National Labor Relations Board petitions the Court for the enforcement of its order of June 26, 1942, against the respondent, following the usual proceedings pursuant to § 10 of the National Labor Relations Act. 49 Stat. 449 (1935), 29 U.S.C., § 151 et seq. (1940), 29 U.S.C.A. § 151 et seq. The proceedings concern the alleged unfair labor practices at the respondent's Seiple, Pennsylvania, plant and the Board's order is confined to violations of § 8 (1) of the Act.[1] The charge that the respondent had refused to bargain with the charging union in violation of § 8 (5) was dismissed. From conceded facts, it is clear that the respondent is subject to the jurisdiction of the Board and the respondent, itself, does not quarrel with this conclusion. The Board found that the conduct of the

---

[1] "Sec. 8. It shall be an unfair labor practice for an employer—
"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7."

respondent interfered with, restrained, and coerced its employees in the exercise of their rights guaranteed in § 7, in violation of § 8 (1) of the Act. Whether these findings are supported by substantial evidence is the principal question in the case and indeed the only question except for a minor one concerning the order requiring the posting of notices. The evidence to support the Board's conclusion consists of three parts. The first is what is called the 1936 background.

In 1936 an attempt was made by the American Federation of Labor to organize, at the Seiple plant, respondent's employees who, up to that time, had never had a union. Thereupon, the employer wrote to its employees a series of letters which the Board found had coerced "the employees into abandoning their organizational efforts." The letters stressed the necessity for the employees' loyalty, spoke of respondent's plans to " * * * take some business which is unprofitable to the Company * * * in the interest of its loyal employees." and questioned whether it could embark on the proposed program unless assured of the full co-operation of its employees. It procured from employees individual pledges "not [to] be a party to any labor disturbance of any sort, and * * * [to] do my best to influence my fellow employees against any such course." The 1936 matter was not part of the complaint in this case and no proceedings were instituted under the Act based upon anything then occurring. The Board in this case considered the evidence merely as "background" because indicative of respondent's attitude to organization among its employees. This the Board could properly do. "The employer's attitude towards unions is relevant." National Labor Relations Board v. Link-Belt Co., 1941, 311 U.S. 584, 588, 61 S.Ct. 358, 85 L.Ed. 368; National Labor Relations Board v. National Seal Corporation, 1942, 2 Cir., 127 F.2d 776, 778.

The second portion of proof in this case consisted of a series of letters written by the respondent to its employees in the spring of 1941 when it was known by the supervisory officials of the company that there was current union activity. This activity had been conducted by a field representative of the C.I.O. who had started the organizational activities in February of that year. The letters bear dates of April 8, April 9, April 10, April 14 and April 25, 1941. They bear little resemblance to the type of employee communication recorded in the decisions of the earlier cases under the Act. Much of their language is innocuous and indeed, standing by itself, could hardly receive anything but an innocent interpretation.

The first letter speaks optimistically of present conditions in work prospects at the plant. It points out that only the employer, and he only through constant and aggressive effort, can supply jobs and that for anyone else to claim that he can provide jobs or job security is nonsense. It points out that no one need join any organization of any sort to have a job with the company; it proclaims that "loyalty of the Company to you will always at least equal your loyalty to the Company" and announces an increase in current period bonus. The next day's letter speaks of company efforts to advance employee welfare saying that the company "would in normal course go a very long way to continue this record for all of our present employees if they indicate an understanding of our problems * * *." The third letter follows in the same vein, summarizing the two before and saying that "all that we desire is the full co-operation of all employees so that all of our relatively small group may enjoy a feeling of security and harmony * * *." The fourth letter, dated April 14, speaks of an increase in average monthly compensation and bonus payment, steadiness of employment and a guaranty of minimum "Year-End Payments" for December, all conditional upon the assumption that the employee "will remain in our employ and work without interruption up to December 31, 1941." Finally, it asks the recipient to sign the statement attached to the letter and return it in the enclosed stamped envelope. After saying that the company did not urge the employee to sign the statement unless he felt it a wise thing to do, it goes on to say: " * * * we would accept quite philosophically your decision not to sign if you were to so decide even though we would then find ourselves in the rather odd position of being restrained from putting forth our best efforts by the very men who would receive relatively the most benefit from our efforts or who in turn would be most harmed if they, by their actions, were to discourage our desire to serve both them and the Country." The concluding paragraph suggests to the

employee that he knows "that it would be impracticable for us to commit ourselves to do important and urgently needed work if there is any possibility whatever of interruption of operations at the plant." The enclosure contained a statement ready for signature that the signer intends "to work steadily without interruption except [sic] for absences for such things as sickness and the like." The closing letter enlarges a little on uninterrupted production and expresses satisfaction with the "substantially unanimous affirmative response" of April 14.

That closes the series of letters. They are carefully worded; certainly there is no threat explicit in the language used. Letters from the employer were not unusual with this company; the exhibits show a series of them generally concerned with explanations of its wage system, insurance plans and the like. But they had not since the former attempt at unionization in 1936, come in any such barrage as the one just described. The last letter, which called for the no strike statement, is certainly capable of being understood to suggest that unless such statement were forthcoming from the employee group there would not be new work at the plant, even though the words are chosen with a fine sense of Victorian delicacy.

The final item in the list is a series of contemporaneous remarks by supervisory employees either to individuals or groups. These include statements by Clarence Koch, general foreman in charge of the research and testing division. He cautioned a group of men about being coerced into joining the union by statements of high entrance fees if they joined later on and referred to the letter which they would receive. Assistant director Boyd of the research department informed a similar group that he wanted the employees to be loyal to the respondent in return for the latter's undertaking business on an unprofitable basis to provide work. Mr. Henry Bronstein, superintendent of the powder plant, emphasized in a conversation to one employee that he did not need to join a union following up the statement with inquiries about the employee's attendance at union meetings. And, finally, Frank Forgan, foreman of the detonator cap section of the plant, said to an employee in the presence of others, that the C.I.O. leaders were in fact saboteurs. Except for the last statement, what the supervisory employees said, like the letters, lacks the venom found in many other cases, some of them in this Circuit.[2]

■ This is in substance what there is to go on. The Board found that in view of all the circumstances that the conduct of the employer was interference, restraint and coercion of the employees. If in fact it was so, it does not invalidate the finding or order to show that some individual employees were not in fact coerced. National Labor Relations Board v. John Engelhorn & Sons, 1943, 3 Cir., 134 F.2d 553 and cases cited therein in footnote 7.

■ The express mandate of the statute gives to the Board, not courts, the responsibility of fact finding. § 10(e). This "precludes an independent consideration of the facts." National Labor Relations Board v. Virginia Electric & Power Co., 1941, 314 U.S. 469, 476, 62 S.Ct. 344, 348, 86 L.Ed. 348. We cannot say that the facts outlined above are incapable of sustaining the conclusion found by the Board. The evidence is capable of a conclusion either in favor of the respondent or against it. The Board has concluded against it. We have no authority to interfere with that finding.

■ A smaller point is the respondent's contention that it has in fact obeyed the order about posting notices so that the question is now moot. Respondent did post a notice in its plant about October 22, 1942. The Board, however, held that the notice posted by the respondent did not meet its requirements and was not, therefore, a compliance. We agree with the

[2] Oughton v. National Labor Relations Board, 1940, 3 Cir., 118 F.2d 486, 489, certiorari denied 1942, 315 U.S. 797, 62 S.Ct. 485, 86 L.Ed. 1198 (union "a bunch of communists and reds"); North Carolina Finishing Co. v. National Labor Relations Board, 1943, 4 Cir., 133 F.2d 714 (union a "bunch of Germans . . . to hamper defense work"); National Labor Relations Board v. Federbush Co., Inc., 1941, 2 Cir., 121 F.2d 954, 955 (union a "bunch of racketeers"); National Labor Relations Board v. Jahn & Ollier Engraving Co., 1941, 7 Cir., 123 F.2d 589, 591 (union officials "don't want you, but want your dues,"; employees warned to be wary of "poison peddlers" and "poison propaganda"; union employees "smart agitators").

Board on this point. The notice posted by the company did have one paragraph which contained, in substance, what the Board's required notice also contained. But it was accompanied by three other paragraphs, the sum total of which would leave a reader with quite a different impression than that of the simple notice directed by the Board. The latter does not, contrary to respondent's argument, involve any compulsion of an admission that the respondent has violated the Act.

The petition for enforcement will be granted.