## NATIONAL LABOR RELATIONS BOARD v. COLLINS & AIKMAN CORPORATION.

### No. 5301.

Circuit Court of Appeals, Fourth Circuit.

Dec. 28, 1944.

Owsley Vose, Atty. National Labor Relations Board, of Washington, D.C. (Alvin J. Rockwell, Gen. Counsel, Malcolm F. Halliday, Associate Gen. Counsel, and Eleanor Schwartzbach, Atty., National Labor Relations Board, all of Washington, D. C., on the brief), for petitioner.

F. L. Fuller, Jr., of Durham, N. C. (William B. Umstead, of Durham, N. C., Robert P. Burns, of Roxboro, N. C., and Albert R. Jube, of New York City, on the brief), for respondent.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This case is before us on a petition of the National Labor Relations Board (hereinafter called the Board) for the enforcement of an order issued by the Board against the Collins & Aikman Corporation (hereinafter called Collins). This order was based upon the Board's finding that Collins had violated Section 8(1) and (3) of the National

Labor Relations Act (hereinafter called the Act), 29 U.S.C.A. § 151 et seq., in that Collins (a) had engaged in surveillance over union activities of its employees and (b) had discriminatorily discharged Arthur Hanks, one of its employees, because of his activities on behalf of the Textile Workers Union of America, C. I. O. (hereinafter called the Union). The only questions before us are whether the findings of the Board are supported by substantial evidence and (if the findings are so supported) whether the Board's order, based on these findings, is a proper order.

We are here concerned only with the mill of Collins near Roxboro, North Carolina. An organizational campaign among the employees of Collins was started in 1937. Plant Engineer Warren called to his office an employee named Wright and questioned him about the activities to unionize the mill. Later, Warren summoned the machinists to his office and warned them that if they joined the C. I. O., they would be working for the C. I. O. and taking orders from it. Warren went on further to state that Collins could not afford to let the C. I. O. run its mill.

The Board, finding no other evidence of unfair labor practices between 1937 and 1942, did not find that the activities of Collins in 1937 constituted unfair labor practices. Yet the Board did consider this 1937 background of union hostility as one relevant element which might be considered by the Board in appraising the conduct of Collins in 1942. This, we think, was entirely proper. N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 588, 61 S.Ct. 358, 85 L.Ed. 368; International Association of Machinists v. N. L. R. B., 71 App. D.C. 175, 110 F.2d 29, 35, affirmed 311 U. S. 72, 78, 79, 61 S.Ct. 83, 85 L.Ed. 50; American Enka Corporation v. N. L. R. B., 4 Cir., 119 F.2d 60, 63.

### (1) Surveillance.

Another campaign to unionize the mill began in July, 1942, when Fred Pearce, a Union Organizer, came to Roxboro at the request of Huey Pearce, an employee of Collins. Arthur Hanks, an employee of Collins, was quickly signed up by Fred Pearce and these two actively distributed union application cards and solicited union memberships among the employees. Most of their activity centered around the village drug store before the end of the second shift at 11 p. m. Word of these ac-

tivities quickly reached the officers of Collins.

Immediately, though it was not their usual custom, Resident Manager Ford, Assistant Resident Manager Bradsher, George Currier, Manager of the Dyeing Department, and others came almost nightly to the drug store and spent several hours there during the hours before the end of the second shift. About three weeks later, when, after the discharge of Hanks and the transfer of Huey Pearce to another shift, the Union campaign ceased, these nocturnal visits of the mill officials to the drug store ceased as suddenly as they had begun. When asked by the trial examiner why these visits to the drug store ceased, Resident Manager Ford naively answered: "Because the organizer had left and there seemed to be no further discussion about him or anything else, so I just dropped back to my usual habits. I have been there occasionally, but that is all."

On direct examination, Resident Manager Ford stated that the reason for his evening visits to the drug store during the period in question was: "I went there because I feared there might be some disorder or violence." Yet, on cross-examination, when asked: "Well, during that period of two weeks or more did you observe any violence?" Ford replied: "No, I did not." Yet these visits of Ford and the other mill officials continued during the organization period. Nor does the evidence disclose any reasonable grounds for the anticipation of disorder or violence.

We think, accordingly, there was substantial evidence to support the Board's finding of surveillance. Nor does it avail Collins to assert that whatever surveillance existed was carried out openly and not surreptitiously. Any real surveillance by the employer over the Union activities of employees, whether frankly open or carefully concealed, falls under the prohibitions of the Act. Republic Steel Corporation v. N. L. R. B., 3 Cir., 107 F.2d 472, 474, certiorari denied 309 U.S. 684, 60 S.Ct. 806, 84 L. Ed. 1027; N. L. R. B. v. Van Deusen, 2 Cir., 138 F.2d 893, 895; Berkshire Knitting Mills v. N. L. R. B., 3 Cir., 139 F.2d 134, 140; N. L. R. B. v. Northwestern Mutual Fire Association, 9 Cir., 142 F.2d 866.

### (2) The Discharge of Hanks.

Hanks, after 12 years of service with Collins, was discharged three weeks after he became one of the militant workers for

the Union, and actively and openly solicited employees at the drug store almost every evening. For more than 4 years, he had been a loom fixer charged with the duty of keeping 12 looms in proper operating condition.

Soon after the beginning of the activities in 1942 to unionize the mill, Carver, a foreman, notified Hanks of his transfer from the third to the second shift. The wife of Hanks also worked on the third shift, on which Hanks for 6 years had worked at his own request. Such a transfer would seriously hamper the union activities of Hanks at the drug store in the evening. Hanks protested to Carver, who stated that the order for the transfer came from "higher up". Hanks then saw Currier (who was then acting as assistant resident manager) to inquire as to the reason of the transfer. Currier cryptically replied: "He knew why it was and at the same time he didn't know" and promised to investigate the transfer. Later that day Currier told Hanks he could stay on the third shift and Currier (presumably referring to the Union) asked Hanks: "Why pay for something that you can get for nothing?"

About two weeks later, Hanks and one of his weavers were called into the cloth room by foreman Dickerson. Dickerson exhibited pieces of No. 3 cloth, which is substandard and the production of this cloth subjects the responsible weavers and loom fixers to deductions in pay. Thereupon Dickerson made accusation that Hanks had not checked the cloth (which was one of his duties) for 3 months, and to this Dickerson added the statement that Hanks did nothing but stand around and eat and drink Coca-Cola. Hanks replied that he checked the cloth whenever he had the opportunity, but that he had not had a chance to inspect the cloth that night as he had been busy in his task of fixing the looms. Unfortunately, Hanks went further and to Dickerson made remarks that were neither courteous nor in the manner prescribed by arbiters of social etiquette, though Hanks claimed provocation for these remarks in the unjust charge suddenly and unexpectedly hurled at him. Dickerson thereupon told Hanks he was discharged and to come in on the next working day, Monday, for his pay.

When Hanks went on Monday morning to see Resident Manager Ford about the discharge, Hanks stated that Ford remarked: "Hanks, I have often wondered what goes on in a man's head when he signs a union card * * * possibly you can tell me." Ford promised to investigate, but later that same day, Ford, without giving Hanks any reason therefor, affirmed the discharge.

The Board rejected the contentions of Collins that Hanks was discharged on the grounds of insubordination and poor work. There appears to have been no claim that any criticism of the quality of work done by Hanks was made before his union activities began. The particular cloth that evoked the complaint of foreman Dickerson was the work of one of the most experienced weavers, operating the looms for which Hanks was responsible. Though rather meticulous records are kept by Collins as to the production of No. 3 cloth, these records were not produced in evidence.

■ Under these circumstances, we think that the Board's finding that Hanks was discriminatorily discharged, in violation of the Act, for his activity on behalf of the Union, is supported by substantial evidence and is, therefore, binding upon us. See Hartsell Mills Co. v. N. L. R. B., 4 Cir., 111 F.2d 291, 293; N. L. R. B. v. Rock Hill Printing & Finishing Co., 4 Cir., 131 F.2d 171, 174, 175; North Carolina Finishing Co. v. N. L. R. B., 4 Cir., 133 F.2d 714, 717, 718; N. L. R. B. v. Baltimore Transit Co., 4 Cir., 140 F.2d 51, 56, certiorari denied 321 U.S. 795, 64 S.Ct. 848; Carter Carburetor Corp. v. N. L. R. B., 8 Cir., 140 F.2d 714, 717, 718.

(3) The Scope of the Board's Order.

■ Collins further complains, since the only violations of the Act found by the Board were the surveillance and the discriminatory discharge of Hanks, these findings do not justify the broad provisions contained in 1(c) of the Board's order. This particular paragraph requires Collins to cease and desist from: "(c) In any other manner interfering with, restraining, or coercing its employees in the exercise of the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the Act."

In support of its contention here, Collins cites N. L. R. B. v. Express Publishing Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. and N. L. R. B. v. Entwistle Manufacturing Co., 120 F.2d 532, decided by this Court. In support of the scope of its order, the Board cites N. L. R. B. v. Pennsylvania Greyhound Lines, 303 U.S. 261, 265, 58 S. Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; Phelps Dodge Corporation v. N. L. R. B., 313 U.S. 177, 187–189, 61 S.Ct. 845, 85 L.Ed. 1271, 133 A.L.R. 1217. A careful consideration of these cases, and particularly the langauge of this Court in the Entwistle case (120 F.2d at page 536) discussing the opinion of Mr. Justice (now Mr. Chief Justice) Stone in the Express Publishing case, convinces us that the scope of the Board's order should not, in the instant case, be narrowed by this Court.

The petition of the National Labor Relations Board for the enforcement of its order will be granted.

Order enforced.