**OLSON RUG COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 12303.

United States Court of Appeals Seventh Circuit.

June 29, 1962.

Frederick W. Turner, Jr., Chicago, Ill., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Paul J. Spielberg, Atty., National Labor Relations Bd., Washington, D. C., for respondent.

Before HASTINGS, Chief Judge, and DUFFY and KNOCH, Circuit Judges.

DUFFY, Circuit Judge.

This case is before us on the petition of the National Labor Relations Board (Board) that Olson Rug Company (Olson or Company) be adjudged in civil contempt of this Court's decree dated December 9, 1958. Questions involved in this prolonged dispute between Olson and the Board have been before us previously in 7 Cir., 260 F.2d 255 and 7 Cir., 291 F.2d 655.

Olson is engaged in the manufacture of rugs and carpeting in Chicago. It employs about 900 to 950 production and maintenance employees in its manufacturing establishment. Textile Workers Union of America, AFL–CIO (Union) won a Board-supervised election on May 24, 1957, by a margin of 53 votes. Over the vigorous objections of Olson, the Board certified the Union as the collective bargaining agent.

Olson refused to bargain with the Union claiming, as it did before, illegal pre-election conduct by the Union. On April 10, 1958, the Board held that Olson's refusal to bargain violated Section 8(a) (5) and (1) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (5) and (1). Olson was ordered to cease and desist from its unfair labor practices and was directed to bargain with the Union. Upon a petition by Olson for a review, this Court, on November 7, 1958, decided the Board's order should be enforced (260 F.2d 255). On December 9, 1958, this Court entered a decree which the Board now claims Olson has violated. Thereafter, the Board instituted proceedings to show cause why the officers, agents and representatives of Olson should not be held in civil contempt.

On December 5, 1960, this Court appointed a Special Master to determine the issues of fact presented by the Board's charge that Olson and its officers and agents should be adjudicated in civil contempt.

Olson and the Union did have a number of bargaining sessions from December 29, 1958 to November 13, 1959. Agreement was reached upon a number of issues. While the negotiations were in progress, the Union, on July 21, 1959, filed an unfair labor practice charge against Olson. In this charge the Union claimed Olson was engaged in sham bargaining; had granted unilateral wage increases during the period of negotiation; had refused to recognize the Union in processing grievances; and through a foreman, had made threats of surveillance of Union meetings. After an investigation of these charges, the Board, on October 23, 1959, notified the interested parties that the charge had been dismissed by the Board.

On November 13, 1959, Olson refused to continue bargaining with the Union and withdrew recognition. On the same day, Olson filed a representation petition with the Board. On November 30, 1959, a number of Olson's employees filed a decertification petition with the Board.

From November 1959 to January 7, 1960, the Board received new evidence relating to Olson's alleged unfair conduct. On January 7, 1960, the Board revoked its earlier dismissal of the charges on the ground of newly discovered evidence and because of Olson's withdrawal of recognition of the Union.

On July 27, 1960 and August 17, 1960, respectively, the Board dismissed the representation petition and the decertification petition consistent with its

practice of dismissal of such petitions while unfair labor practice charges are pending.

The contempt petition filed by the Board charges Olson with the following conduct which it claims to be contemptuous of this Court's decree of December 9, 1958:

a) Olson instituted unilateral changes in its wage structure without consulting the Union;

b) Olson employed undercover operatives to observe and report on Union attitudes and the activities of its employees;

c) Olson employed undercover operatives to learn and report on the Union's bargaining strategy;

d) Olson withdrew recognition from the Union and refused to bargain further in the absence of good faith doubt of the Union's majority status.

The Special Master conducted hearings on twenty-five days between January 12 and September 15, 1961. He has made and filed with this Court fourteen findings of fact, ten conclusions of law and has made three recommendations.

A Special Master's findings of fact are not to be set aside unless clearly erroneous. Polish National Alliance, etc. v. N.L.R.B., 7 Cir., 159 F.2d 38, 39. In Polish National, this Court appointed a Special Master to make findings of fact on certain issues. We there said (159 F.2d 39): "Ordinarily a Master's findings are not to be set aside unless clearly erroneous. This is the provision of the Federal Rules of Civil Procedure, Rule 53(e) (2), 28 U.S.C.A. * * * pertaining to District Courts. We are of the opinion that a similar rule should be applicable to the instant situation. * * *"

To the same effect, see N.L.R.B. v. Standard Trouser Co., 4 Cir., 162 F.2d 1012, 1014; N.L.R.B. v. International Hod Carriers', etc., 2 Cir., 228 F.2d 589, 591; N.L.R.B. v. Spartanburg Sportswear Company, 4 Cir., 278 F.2d 312, 313.

There is evidence in the record which the Master was entitled to believe which establish the facts which we hereinafter describe.

The Master found that Olson failed to bargain in good faith with the Union and thereby violated this Court's decree. The Master further found Olson disobeyed our decree by engaging undercover operatives 1) to report on Union activities and attitudes of its employees, and 2) to learn the Union's bargaining strategy and to report such strategy to the Company in advance of bargaining sessions. The Master also found Olson withdrew recognition from the Union in the absence of good faith doubt of the Union's majority status.

The Company argues that the Special Master did not make a specific finding of fact that the agents failed to bargain in good faith. However, he did make specific findings as stated above which, if substantiated by the record, would necessarily result in the conclusion that Olson failed to bargain in good faith.

In N.L.R.B. v. Warren Company, Inc., 350 U.S. 107, 76 S.Ct. 185, 100 L.Ed. 96, the Supreme Court considered the question of good faith bargaining under circumstances quite similar to this case. There, the Court said (page 112, 76 S. Ct. page 187) the question for determination was " * * * whether an employer who has been found guilty by the Board of unfair labor practices in refusing to bargain with a union designated as the exclusive representative of its employees and who has been directed to so bargain, is, after a decree enforcing the order and without remedying its unfair labor practices, legally justified in refusing to bargain with the union because it contends the union does not in fact have majority status in its plant, or must such employer bargain fairly for a reasonable length of time in accordance with the order to avoid an adjudication in civil contempt."

The Court further said: "We believe that an employer in such circumstances cannot lawfully refuse to bargain; that he must do so for a reasonable time; and

that for a failure to so bargain it is the statutory duty of the Court of Appeals on petition of the Board to adjudge him in contempt of its enforcement decree."

On December 29, 1958, the Company and the Union met for the first of twenty-five negotiating sessions. At the second session, on January 9, 1959, the Union submitted a contract proposal which was complete except for a wage clause.

The Company's cost-of-living plan called for adjusting the allowance semi-annually. In January 1959, the allowance was 11 cents per hour. A decline of the cost-of-living index of .6 would permit the Company to reduce the allowance from 11 cents to 10 cents. A drop in the index was expected. Mr. Sikorski, bargaining for the Company, indicated that the Company would make the cut. McGrew for the Union told a meeting of the employees to expect such a cut, explaining it was not a wage cut, but resulted from the contract. However, the following morning, the Company announced that the full 11 cent allowance would remain in effect in spite of a reduction in the cost-of-living index figures.

By the seventh meeting the opening positions of the Company and the Union were fully disclosed. The Union asked a general increase of 15 cents an hour, a pool of 3 cents an hour to correct inequitable piece rates; incorporation of 11 cents cost-of-living in the wage scale, and the adjustment of this allowance every three months instead of every six months. The Union proposed an additional paid holiday, improvements in the Company's vacation plans, and a Christmas bonus.

The Company offered to continue the wage scale and the vacation plan then in effect. It offered no economic benefits. It was the position of the Company that it had to keep in step with rug companies in the east, and that they had given no recent wage increases.

At the eighth meeting, the Union presented material from the Bureau of Labor Statistics to show that Olson employees in certain craft jobs were paid substantially less than the going Chicago rates. Machinists, millwrights, painters, pipefitters, sheet metal workers and lift truck operators were the classifications which were mentioned. The Company refused to make an exception to its no-raise policy. However, within the next few months, the Company, without a word to the Union, gave raises to twelve employees in six separate classifications as follows: sheet metal workers; machinists; millwrights; pipefitters; painters and lift truck operators. After the raises, eight of these employees were making more than the Company had offered the Union for these jobs.

During the same period, the Company gave raises to twenty-four other hourly rated employees, again without any notice to the Union. These raises brought the pay of four of these employees above the Company's offer for similar work.

At the May 22nd meeting, the Company insisted there had been no wage movement in the eastern rug mills, and accordingly the Company could not consider a wage increase. It stood firm on holiday and vacation plans. On June 4, the Union agreed to the Company's vacation and holiday proposals with one minor change.

At the 20th meeting on July 10, the Union asked the Company to dismiss a grievance over a pay rate. The Company refused such request until such time as a contract was signed. At this meeting Sikorski, for the Company, admitted that the Company had given a number of pay increases to employees during the period of bargaining. The Union promptly filed unfair labor practice charges with the Board.

At the meeting on August 26, the Union pointed out that eastern rug mills had granted general wage increases. However, the Company's position on wages remained unchanged.

A meeting was scheduled for November 13. A few hours before the time fixed for the meeting, the Union received a telegram from the Company informing it that the Company doubted its majority

status, and would not bargain with it "until the National Labor Relations Board resolves the question of your majority status."

On December 18, the Company announced a bonus from $10 to $75 dependent on length of service, although "our business has not been good for the past two years." The Company also advised its employees it was making the 11 cent cost-of-living allowance a permanent part of their wages. On February 12, 1960, the Company notified its employees that the allowance was increased by 2 cents, but thereafter the Company would adjust the allowance every three months. This was a change which the Union had proposed.

Undercover agent Golz worked in the measuring department and in the contract carpet department. He had reported to the Company that there was increasing dissatisfaction among the employees of these departments with reference to their wages. Just as the Company broke off relations with the Union, it gave raises to all employees in these departments.

As might be expected, the Company places great emphasis on the fact that previously filed charges of unfair labor practices by the Union were dismissed by the Board on October 23, 1959. Included in these charges were: the Company had engaged in sham bargaining; had granted unilateral wage increases during the period of negotiation, and had made a threat of surveillance of Union meetings.

However, after the Company had refused to continue bargaining, and from November 1959 to January 7, 1960, the Board renewed its investigation and received much additional evidence. The fact that the Board did not believe the original charges were substantiated by the evidence then before it, cannot foreclose the Board from reaching a contrary conclusion after receiving much additional evidence.

Referring now to the alleged Union espionage. The Company strongly urges that the record discloses no more than a Company practice of many years' standing, of hiring undercover operatives to check on theft, sabotage, and other matters of plant security.

The record discloses that operatives of the Illinois State Detective Agency worked as employees of Olson. During October 1958, two such operatives were employed. In November 1958 this Court ordered enforcement of the Board's order that the Company bargain with the Union. The following month the number of undercover operatives rose to five.

These operatives made daily reports to the agency. The original reports were typed at the agency office. The ribbon copy went to personnel director Sikorski; one copy was sent to the plant superintendent and one copy to the confidential secretary of President Walter Olson. The agency retained a copy. The Company officials received their copies of the reports at their home addresses. They made it a practice of destroying their copies of the reports after reading them.

There is evidence that Golby, the proprietor of the detective agency, in November 1958 told operative Nolan Talley that his main job would be to report what he could learn about the Union activity at the plant. Golby gave Talley a code which he could use to call Sikorski from a telephone inside the plant, and thus not reveal Talley's position as an undercover operative.

Talley was used as a distributor of yarn. This brought him in contact with the weavers on the fourth floor. Talley struck up an acquaintance with Montez Graves, a weaver, who was on the Union's negotiating committee. Talley obtained a membership card from Graves and joined the Union. He then endeavored to become a member of the Union's Communications Committee. This was a group of about twenty-five of the Union's most active supporters. It met periodically to discuss Union affairs. Talley was appointed to this Committee. He attended a meeting on April 18, 1959, and on subsequent dates. He also at-

tended every general meeting which the Union called between December 1958 and December 1959. He became a confidant of Graves.

In his daily reports, Talley related in full detail what he had seen and heard at Union meetings, and what he had learned from Montez Graves. He called Golby once or twice a week and talked about the Union situation at Olson. During 1959, he called Sikorski at his home six or seven times when he had some information he thought Sikorski should have without delay.

Shortly before Christmas, 1959, Graves indicated to Talley that his double role had been discovered. Talley telephoned Golby who told him to report that evening to the office of the detective agency. Talley found Golby and his wife there going through the office copies of his reports. They removed all reports that referred to Union matters. Golby asked Talley to manufacture about seventy reports, undated, and without any mention of the Union. Talley typed out the dummy reports and delivered them to Golby. The dummy originals were dated by Golby to fill the gaps made by his removals from the Talley file.

The Company strongly argues that the testimony of operative Nolan Talley is the basis for the Master's findings and conclusions on the question of anti-union espionage. Olson argues the testimony of Talley was worthless and not entitled to any credence and, therefore, the Master's findings on this point must fall.

On the reopened case, the Board had called Talley as an adverse witness. His testimony favorable to the Company was obviously untrue in a number of respects. The Special Master at one point did refer to him as "[un]worthy of belief under any circumstances."

Talley later testified that after his first testimony he went to the Chicago office of the Labor Board and talked with Board attorney Spielberg, and stated he came "to have an opportunity to tell the truth in this testimony, the testimony as given prior. I wanted to come forward and have an opportunity to tell the truth before I'd get myself involved any further in this matter."

■ The Special Master refers to Talley as "a pathetic figure", but points out that his readiness to perjure himself as an adverse witness does not compel the Master to disbelieve his subsequent testimony which was corroborated by other evidence in this case. We agree with the Special Master.

■ The Special Master makes several references to the vitriolic bulletins issued and circulated by the Union. Such bulletins are indeed a reflection upon the Union leadership which authorized them. However, we agree with the Master that these bulletins did not furnish a valid ground for the Company to refuse to bargain in good faith nor do they justify the espionage of Union activities which the Company inaugerated and carried out.

■ We approve of and confirm the findings and conclusions of the Special Master. An order will be entered that the Company, its officers, representatives and agents be adjudged in civil contempt for disobeying and failing and refusing to comply with the decree of this Court. The order will also provide that the Company, its officers, representatives and agents purge themselves of such contempt by

a) Notifying the Union that it is ready to resume negotiating with the Union on a collective bargaining agreement;

b) Upon request by the Union, bargaining collectively with the Union, and if an understanding is reached, embodying such understanding in a signed agreement;

c) Ordering each and every undercover operative in the Company's employ to desist from surveillance of the Union activities and attitudes of the Company's employees, and from reporting such information to the Company.

The Company and the Board each agreed to deposit $5,000 to cover the fees, charges and expenses of the Special Master. The Company made such a deposit on March 9, 1961. The Board has not made the deposit as it agreed, stating it could not do so without a specific order of the Court.

The Special Master has submitted a statement showing a total of 241¾ hours utilized and spent in performing his duties as such. This statement is approved. An order will be entered that the Master's fees as stated will be borne equally by the Board and the Company. The balance of the costs, including the cost of printing briefs, shall be borne by the Company.

The report of the Special Master is approved and confirmed.