The FLUOR CORPORATION, Ltd., a California Corporation, Plaintiff-Appellee,

v.

ILLINOIS POWER COMPANY, an Illinois Corporation, Defendant-Appellant.

No. 14073.

United States Court of Appeals Seventh Circuit.

Jan. 9, 1964.

Robert L. Stern, James B. O'Shaughnessy, Chicago, Ill., Herbert A. Friedlich, David M. Wishnick, Chicago, Ill., Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., Alexander Polikoff, Chicago, Ill., Dallstream, Schiff, Hardin, Waite & Dorschel, Chicago, Ill., for appellant.

Owen Rall, Chicago, Ill., Timothy I. McKnight, Evanston, Ill., James D. Harris, Los Angeles, Cal., Herbert C. Loth, Jr., Chicago, Ill., Peterson, Lowry, Rall, Barber & Ross, Chicago, Ill., Voegelin, Barton, Harris & Callister, Los Angeles, Cal., of counsel, for appellee.

Before HASTINGS, Chief Judge, and CASTLE and KILEY, Circuit Judges.

HASTINGS, Chief Judge.

This action was brought by The Fluor Corporation, Ltd., against Illinois Power Company (IPC) to recover $500,786.93, which represents the balance claimed to be due under a cost-plus contract to build an addition to a power plant.

IPC denied liability and counterclaimed for $2,500,000, claiming that Fluor breached the contract by not supervising its labor force with reasonable care and skill, thus increasing IPC's costs.

The district court had jurisdiction under 28 U.S.C.A. § 1332. The case was referred to a special master as provided in Rule 53, Federal Rules of Civil Procedure, 28 U.S.C.A. The special master was ordered to take and hear evidence and to report findings of fact and conclusions of law. Ferre C. Watkins, Esquire, a reputable member of the Chicago, Illinois Bar, qualified and served as the special master throughout this proceeding.

Hearing was had before the special master who entered findings of fact, stated conclusions of law and recommended judgment in favor of Fluor and dismissal of IPC's counterclaim.

The district court, after receiving briefs and hearing oral argument for about two days, entered judgment in accordance with the special master's recommendations. IPC appealed.

Between 1947 and 1950, IPC, an Illinois electric and gas public utility company, built an electric power generating station, consisting of three generating units, at Wood River, Illinois, a few miles north of East St. Louis, Illinois. Early in 1951, IPC decided to construct a fourth unit at the same site, as an addition to the existing installation.

Fluor, a construction contractor operating nationally, with headquarters in

Los Angeles, learned of IPC's intention to build the fourth unit at Wood River. In April, 1951, Donald Darnell, then Fluor's president, wrote Allen Van Wyck, president of IPC, requesting an appointment with Van Wyck at IPC's offices to discuss the possibility of a construction contract.

A meeting took place between Van Wyck and Darnell in Chicago in May, 1951. Van Wyck told Darnell that the contractor whom IPC employed to construct the first three units had encountered and tolerated hunting and cooking by employees during working hours, had hired unnecessary labor and had paid stewards who did not work. Van Wyck said he wanted the contractor for the new work to keep the labor crafts in line and not tolerate abuses by labor. He stated that IPC wanted the unit completed on time, but if labor difficulties became great, Fluor would be authorized to cease construction. Wood River was one of the worst labor areas in the country.

Darnell replied that Fluor had considerable experience in handling construction work in the Wood River area and that he was familiar with labor practices there. He said that Fluor had not tolerated such practices on its other jobs in the area and would not tolerate them in the proposed work for IPC.

Also discussed at this meeting were the qualifications of the superintendent Fluor would appoint to supervise the project, if awarded the contract. Van Wyck said this would have an important effect on who would get the contract.

Darnell told Van Wyck that Fluor's chief of construction, William Downey, and one of Fluor's "top men," William Hudson, had held supervisory positions in the Wood River area and had knowledge of the working conditions.

Subsequently, a letter from Darnell to Van Wyck stated that Hudson had been selected as general superintendent in the event Fluor was awarded the contract.

On November 15, 1951, a contract was signed by Fluor and IPC. It contained a merger clause which said, "The Agreement * * * supersedes any and all prior agreements, proposals, negotiations and representations * * *."

A *force majeure* clause provided:

"CONTRACTOR shall not be held liable for loss or damage if and to the extent any delay, failure, loss or damage is caused by occurrences beyond the control of the party affected, including but not limited to * * * riots, strikes, labor or employment difficulties * * * or any causes * * * not within the control of the party affected and which, by the exercise of reasonable diligence, said party is unable to prevent."

Fluor was given "complete control over the details of the work and the manner in which the work * * * [was] to be accomplished. * * * [Fluor was to] follow the desires of * * * [IPC] only as to the results to be achieved."

The contract provided that IPC would pay Fluor its construction costs, plus a fee based upon varying percentages of Fluor's expenditures for labor, materials and subcontractors. The fee was not to be less than $350,000 nor more than $425,000.

The following procedures were agreed upon for reimbursement of costs. Fluor was to invoice IPC semi-monthly for all reimbursable costs. Before each semi-monthly invoice was finally submitted, IPC's accountants and Fluor's accountants on the job were to check the supporting papers and agree upon the amounts and the matters going into the invoice. The invoice would then be approved by IPC's accountants on the job and by the resident Sargent & Lundy engineer, who was IPC's representative under the terms of the contract. Next, the invoice was to be forwarded to Sargent & Lundy's Chicago office for examination and certification as payments for which Fluor was entitled to reimbursement under the contract. The invoice would then be sent to IPC's main office at Decatur, Illinois, for further

examination and approval. It would be marked "passed for payment" by an official of IPC, and a check issued by IPC to Fluor for the amount of the invoice.

The work was to be conducted under the general supervision of the consulting engineers, Sargent & Lundy, the field representative of IPC. Fluor was to refer all questions to them which arose on the work and affected IPC.

Fluor agreed to keep and maintain complete and detailed records of all costs it incurred under the contract, for three years after completion of the contract, as required by Illinois law.

IPC was given the right to inspect and audit all of Fluor's "books, accounts and records and costs of all equipment, machinery, apparatus, materials, supplies, labor and other items of cost as invoiced."

Fluor completed the cost-plus contract and on March 19, 1954, IPC took possession of the construction. No complaint was ever made by IPC as to the quality of construction. From July, 1951, to March, 1954, Fluor paid out and was reimbursed approximately $7,000,000. About half this amount was for labor.

At the date of completion, IPC had not reimbursed Fluor for invoices numbered seventy-one through seventy-nine. These invoices represented sums which Fluor had expended for labor, materials and subcontracts, and the balance of the agreed maximum fee of $425,000. This fee balance of $75,000, together with costs of $425,786.93, made a total of $500,786.93. These invoices were signed and approved for payment by IPC, in accordance with the procedures previously described.

Van Wyck in a letter to Darnell, dated March 8, 1954, said it was his opinion that a fee of $425,000 had not been earned. No claim was made that the costs were unreasonable. A conference date was set to attempt settlement.

On July 2, 1954, IPC's comptroller wrote to a director of IPC, enclosing a schedule showing amounts invoiced, unpaid and claimed to be due to Fluor, which totaled $500,786.93. The letter stated, "There are minor items which we have questioned or will take exception to which are included in these invoices. Such items are not significant to require specific discussion at this time but shall be raised before any payments are made upon the settlement of the entire account." This balance was never paid.

On August 11, 1954, Fluor filed a complaint in the district court, alleging its compliance with the contract and IPC's failure to pay the balance due thereunder. Fluor prayed judgment for the sum of $500,786.93, together with interest at 5% per annum.

On December 15, 1954, IPC filed an answer and counterclaim. The answer denied contract liability stating that Fluor did not perform "the work in a diligent or workmanlike manner" and did not perform "its duties and obligations under said contract."

The counterclaim alleged breach of contract, negligent performance of the contract and fraudulent misrepresentations which induced IPC to enter into the contract. It asserted that Fluor "failed to employ and supervise the labor force in a diligent, skillful, workmanlike and economical manner" and as a result IPC's "funds were improperly, wastefully and extravagantly expended." IPC claimed $1,000,000 damages for increased costs caused by Fluor's alleged breach of contract. On March 3, 1958, IPC amended its claim of damages by increasing the amount to $2,500,000.

Fluor filed a reply to defendant's counterclaim, which denied Fluor's breach of contract and asserted estoppel, waiver, ratification, accord, and accord and satisfaction as affirmative defenses. In support of these affirmative defenses, Fluor asserted, in essence, that IPC, with full knowledge, paid all costs up to December 31, 1953, without objection, and with full knowledge approved for payment the invoices in issue numbered seventy-one through seventy-nine.

IPC filed a motion to strike Fluor's affirmative defenses. The district court in granting the motion said, "In general,

* * * [Fluor] has set out substantially the same factual averments to support the defenses of estoppel, waiver, ratification, accord, and accord and satisfaction. After scrutiny of the pleading, it is the Court's opinion that * * * [Fluor's] allegations do not as a matter of law set forth the elements to establish these defenses."

On January 30, 1958, the district court entered an order referring the case to the special master. The hearing before the master lasted more than two years. During that period, 144 hearing sessions were held, more than 15,000 pages of testimony were recorded and thousands of pages of exhibits and more than 800 pages of briefs were filed.

Voluminous evidence was offered before the special master on the issue of Fluor's breach of contract. It would be impractical to detail all instances of alleged mismanagement and the counter arguments thereto.

IPC contended that the superintendents Fluor assigned to the project had no previous supervisory experience in the Wood River area, had a lax attitude toward labor and permitted improper labor practices.

IPC contended that the evidence which it introduced established that Fluor breached the contract by permitting the following improper labor practices: paying employees for time when they were not on the job site; oversize work crews; loafing on the job; unnecessary work; general disorder and lack of discipline. IPC introduced evidence in an attempt to establish that these improper labor practices were not generally permitted elsewhere in the Wood River area and therefore could not be termed "area practices."

Fluor introduced evidence tending to show that it had exercised reasonable skill in supervising employees and had not breached the contract.

Hudson, whom Fluor had tentatively selected to superintend the project due to previous experience in the area, became unavailable for the project. This occurred when Fluor's construction vice-president, Downey, became ill in June, 1951, and Hudson was needed to assist Downey in the Los Angeles area.

During the period of construction, Fluor, at different times, had Henry Smothers, Chester Followell and William Vann serving in the position of superintendent. IPC approved a merit raise for Smothers. At IPC's request and expense, Followell was retained as liaison between IPC, Fluor and subcontractors, when Vann replaced Followell as superintendent. In March, 1953, Fluor asked IPC to let Fluor put Vann on another job. IPC strongly objected and Fluor allowed Vann to remain. At no time during construction did IPC complain in writing about Fluor's supervision of labor.

Several witnesses for Fluor testified as to "area practices" which existed in the Wood River area at the time. The laborers' written agreements contained a clause that, "The Labor General Foreman shall be appointed by the Business Agent [of the union]. * * * All foremen shall be members of * * * [the local union] for at least a year * * *. * * * The foreman shall have the right to handle and place all men under him." This area practice precluded Fluor from using its own foremen. Testimony was that experience in the Wood River area demonstrated this practice to result in the general contractor losing practically all control over the behavior of laborers.

Testimony concerning other area practices was to the effect that foremen were paid overtime if one man of their craft was working; one laborer helper had to be put on the job for every two carpenters; helpers would discard forms rather than clean and reuse them; laborers who performed preparatory work on certain phases of construction claimed the right to stand by and get the same pay as those who performed subsequent work.

Each time an area practice was claimed by labor and a work stoppage threatened, Fluor's superintendent, Vann, personally visited other contractors' jobs in the area

to substantiate the claimed practice. Vann would then discuss the practice with IPC's vice president, Eugene Hight. Hight at one time told Vann that he was aware of the peculiar practices in the area and for Vann to do the best he could to control them.

There was testimony that many national contractors had what they called a Wood River labor factor of "one point five." This meant that the labor cost in Wood River would be one and one-half times that in other areas.

At the trial before the special master, Fluor offered evidence which IPC claimed was in support of the affirmative defenses previously ordered stricken by the district court. IPC objected to this evidence, contending that the district court's order precluded the consideration of any evidence on these issues.

The special master overruled this objection, stating:

"After full study of the memoranda filed herein by the parties and the arguments of counsel regarding all issues involved herein, it is the considered opinion of the Special Master that the orders entered by * * * [the district court] were limited to holding that the Affirmative Defenses in the form, manner and subject at that time before him did not 'as a matter of law set forth the elements to establish these defenses'. The Special Master finds that * * * [the district court] did not rule, directly or by implication, upon the issue of Fluor's right to introduce relevant evidence under its reply in defense of the charges made in Illinois Power's Counterclaim. The Special Master further finds that such evidence is not barred as the result of such orders if it is relevant to the issues raised by Fluor's reply to Illinois Power's Counterclaim and is otherwise admissible."

In his final report, the special master made, *inter alia*, the following findings of fact on the breach of contract issue.

"14. * * *

"From this evidence, it is clear that:

"(a) Labor costs in the Wood River area prior to the time Unit 4 was started and continuing throughout its construction were greatly excessive as compared with other areas, due essentially to the lack of productivity of workmen of all crafts. The Korean War increased this problem. Illinois Power was familiar with the restrictive practices, feather bedding and low productivity of the building trades in the Wood River area in building Units 1, 2 and 3. Fluor was familiar with these conditions because of its refinery work for Shell Oil Company in the Wood River area from 1935 up to and including the time Fluor was building Unit 4.

"(b) The standard of performance by which Fluor is to be judged is what reasonably might be expected in terms of labor management and controls of a similar contractor performing a construction contract under the same or similar circumstances. Any accurate assessment of Fluor's 'common law duty to perform with care, skill, reasonable expedience and faithfulness the thing agreed to be done' (38 Am.Jur., p. 662) starts with the consideration of the labor atmosphere or area-wide condition in which Fluor had to perform its job.

"(c) The Wood River area during the period of the performance of Fluor's contract with Illinois Power presented great difficulties to an owner or contractor trying to control labor costs and complete the job within the time called for by the contract. The record clearly shows the existence of the so-called 'Wood River labor factor', which greatly increased the costs of construction in that area as compared with labor costs in comparable areas in the United States.

"(d) Fluor was employed to build Unit 4 for Illinois Power, not to reform the Wood River area labor practices. Fluor completed its work on Unit 4. Illinois Power accepted the completed work without any claim as to defective work. Illinois Power never called on Fluor to replace or repair any defects.

"(e) The invoices for labor were paid by Illinois Power with knowledge, or the means of knowledge of the facts. As Fluor was working on a cost plus contract, it kept Illinois Power informed so that Fluor would be assured of reimbursement. Illinois Power had knowledge of all material data, facts and circumstances which formed the basis for the amounts as to which Fluor asked reimbursement on invoices submitted.

"(f) The full record is replete with Illinois Power's knowledge of the labor costs when it paid the invoices for which it now counterclaims and seeks to recover from Fluor. * * *

"(g) As the job progressed and Illinois Power had knowledge of the labor and other practices complained of, Illinois Power did not at any time advise Fluor that it would not pay for the labor cost incurred for any particular practice. The simple expedient of Illinois Power's refusing to pay the cost would have avoided this lawsuit. It appears also that such action would have resulted in a work stoppage and the job would have been shut down. Neither party evidently desired this result, so the work continued, burdened with the labor practices complained of. Illinois Power merely indicated 'full support' in correcting labor conditions * * *, but never refused to pay the labor invoices in question.

"(h) The labor practices complained of in Illinois Power's counterclaim were not caused by Fluor, nor did they prevail on the construction of Unit 4 because of Fluor's unskillful and negligent manner in handling the work force.

"(i) Fluor's performance in the terms of labor management and the management of other details of the job measured up to its duty to perform with care, skill, reasonable expedience and faithfulness under the facts and circumstances of the Wood River job on Illinois Power's Unit 4. There was no material breach of its contractual obligations and duties to Illinois Power under all the facts and circumstances of this case, and Fluor was not guilty of negligence."

The special master entered *inter alia,* the following conclusions of law:

"2. Fluor has fully and properly performed all conditions on its part to be performed under its contract with Illinois Power and has not materially breached said contract.

"3. Fluor has proved its complaint and shall, therefore, recover from Illinois Power the sum of $500,786.93 together with interest at the rate of five (5%) percent per annum from May 18, 1954, and costs.

"4. Illinois Power has failed to prove the allegations of its counterclaim, and the counterclaim must be dismissed.

* * *

"9. Illinois Power was under a duty to exercise reasonable care and diligence to avoid loss or to minimize or lessen the resulting damage. Under all the evidence in this cause, such duty was breached.

"10. Illinois Power has not proved that Fluor mismanaged the Wood River area labor; that Fluor made excessive or unnecessary expenditures for labor; or that Fluor breached the contract. Fluor's per-

formance measured up to its duty to perform with care, skill, expedience and faithfulness under the facts and circumstances of the Wood River job on Illinois Power's Unit 4. Fluor did not materially breach its contractual obligations and duties to Illinois Power under all the facts and circumstances of this case and was not guilty of negligence."

The special master also concluded that IPC's claim for damages because of delay, fraud and deceit was not established by credible evidence.

IPC filed objections to the special master's report in the district court. The district court, after hearing oral argument, overruled the objections and adopted the findings of fact, conclusions of law and final report of the special master. Judgment was entered accordingly.

The issues presented to this court on appeal are: whether the special master's findings, as adopted by the trial court, on the issue of breach of contract are clearly erroneous; whether the special master made sufficient supporting subsidiary findings to comply with Rule 52 (a), Federal Rules of Civil Procedure, 28 U.S.C.A.; whether the special master erred in allowing the introduction of evidence which related to affirmative defenses which had been stricken by the district court; and, whether the special master erred in concluding that the theories proposed to determine IPC's damages were not reliable.

## I.

In determining the correctness of the findings of fact, we look first to the requirements of Rule 53(e) (2), 28 U.S. C.A., which provides:

"(2) *In Non-Jury Actions.* In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous. Within 10 days after being served with notice of the [master's] report any party may serve written objections thereto upon the other parties. Application to the court for action

upon the report and upon objections thereto shall be by motion and upon notice as prescribed in Rule 6(d). The court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions."

The procedure thus commanded was followed in the district court. The correctness and sufficiency of the master's findings, conclusions and report were challenged by IPC's objections. After extensive briefing and oral argument, the trial court overruled all objections and adopted and confirmed, without change, the report, findings and conclusions filed by the master. Judgment for Fluor on its complaint and against IPC on its counterclaim was rendered thereon.

■ It is well established that a special master's findings of fact are not to be set aside unless clearly erroneous. Olson Rug Company v. N. L. R. B., 7 Cir., 304 F.2d 710, 712 (1962); Knab Co. v. St. Mary's Hospital, Inc., 7 Cir., 286 F. 2d 854, 856–857 (1961); Troyak v. Enos, 7 Cir., 204 F.2d 536, 542 (1953); Polish National Alliance, etc. v. N. L. R. B., 7 Cir., 159 F.2d 38, 39 (1946).

In Findings 12 and 13, the contract issue was properly stated:

"12. Fluor owed Illinois Power the 'common law duty to perform with care, skill, reasonable expedience and faithfulness the thing agreed to be done.' (38 Am.Jur., page 662)

"13. Illinois Power claims that Fluor failed 'to manage the labor force with the contractually required skill', and that 'this law suit arises from Fluor's failure to perform its work, particularly its management of the labor force, with care and skill.' "

After reciting numerous evidentiary findings, Finding 35 summarizes in this fashion:

"35. Fluor employed the required degree of skill, care and caution in the performance of its duties.

It was not negligent and unskillful in the particulars and to the extent set forth in paragraphs 10 through 18 of Illinois Power's counterclaim or in any other respect."

It requires no stretch of imagination to envision what took place before the special master. The voluminous transcript of the record below, together with a joint appendix of 884 pages on file in this appeal, graphically portrays the character of the controversy in litigation. A consideration of the whole record quickly reveals the sharp disputes and contradictions in evidence on salient critical issues.

■ A competent master sat in impartial review. We are bound by his determination of matters of credibility and weight to be assigned to that which he heard. The district court heard the parties in first review. It confirmed the master. Under these circumstances, our review of the proceedings below leaves no doubt in our minds that there is sufficient substance in the record before us to warrant the conclusion that the findings of fact under review on the issue of breach of contract are not clearly erroneous and must be confirmed.

■ We hold that, under the record in this case, Fluor honestly and faithfully performed its contract in all material and substantial particulars and was entitled to recover thereon. Further, there was. no error in dismissing IPC's counterclaim.

II.

■ IPC contends that the findings of fact are insufficient in that there were not included subsidiary findings to support the final conclusionary findings so that, as a matter of law, they fail to comply with Rule 52(a), supra. In particular, IPC argues that there are "no findings from which it can be determined whether Fluor's failure to manage labor efficiently with respect to each such practice was worse than or justified by an alleged 'area practice.'" We disagree.

We have carefully reviewed the record and the findings in this respect. The record substantially supports the findings made. The findings are, in our judgment, sufficient to comply with Rule 52(a), supra. It would add nothing to the proper determination of this prolonged litigation to remand it for further findings.

III.

■ IPC strenuously argues that there was prejudicial error when the special master, over its objection, permitted introduction of evidence which it contends related to Fluor's stricken affirmative defenses to IPC's counterclaim. The same argument was made before the master and before the district court. We think this contention is not well taken.

The district court struck Fluor's affirmative defenses as being insufficient as a matter of law in that the facts pleaded therein were not sufficient to support the defenses pleaded. It was that and nothing more. It is true that in the absence of affirmative pleading, such defenses could not be supported at the hearing.

However, the evidence admitted by the master was relevant on the issue of contractual performance by Fluor. We are dealing here with a cost-plus contract, not a lump sum payment contract. The incurring of excessive labor costs was of vital concern to IPC. It charges a breach of contract primarily on that issue.

In such a situation, we fail to see how IPC can complain of evidence tending to show that it made full payment of labor costs up to the time it accepted delivery of the construction, having full knowledge of the facts surrounding such payments. We have been shown no authority holding such evidence to be inadmissible on the issue of performance of a cost-plus contract.

Further, since we have held that Fluor did substantially perform its contract and that there was no breach, IPC's counterclaim necessarily falls and evidentiary issues relating thereto are not now material.

Similarly, contentions made with reference to the theories of proof of dam-

ages under IPC's counterclaim need not further concern us.

## IV.

Having held that Fluor performed and did not breach its contract, there can be no serious dispute as to the amount due under the complaint. The evidence established quite conclusively that the amount sued for, $500,786.93, plus interest, was properly entered in the judgment below.

We have carefully considered the many arguments advanced on all propositions urged by both parties. A host of authorities on various aspects of contract law has been cited, much of which is not in dispute. However, in the final analysis, this appeal is primarily concerned with questions of fact. The parties have had their "days" in court. The issue has been finally resolved favorably to Fluor and adverse to IPC.

Finding no prejudicial error on appellate review, the judgment appealed from is in all respects affirmed.

Affirmed.