**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SOUTHWIRE COMPANY,**
and
**Roy Richards, Respondents.**

**Nos. 20008, 21784.**

United States Court of Appeals,
Fifth Circuit.

July 27, 1970.

Rehearing Denied and Rehearing En Banc Denied Oct. 28, 1970.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel Paul Elkind, J. L. A. de Passalacqua, Solomon I. Hirsch, Alfred Brummell, Attys., N. L. R. B., Washington, D. C., for petitioner.

Swift, Currie, McGhee & Hiers, Frank M. Swift, Albert E. Phillips, Walter O. Lambeth, Jr., David M. Vaughan, Atlanta, Ga., for respondents.

Before SIMPSON, MORGAN and INGRAHAM, Circuit Judges.

SIMPSON, Circuit Judge:

Old labor cases never die nor unfortunately do they fade away. This case is no exception.[1]

On May 8, 1968, a Special Master was appointed by this Court to take testimony and receive evidence with respect to the issues raised by the Board's petition which prayed that Southwire Company and Roy Richards, its president, be adjudged in civil contempt for failing to comply with two decrees of this Court, NLRB v. Southwire Company, 5 Cir. 1963, 313 F.2d 638, and NLRB v. Southwire Company, 5 Cir. 1965, 352 F.2d 346. The Master has made such findings and recommends that Southwire and Richards be adjudged in civil contempt. The Board, in the main, urges that the Mas-

---

1. See NLRB v. Southwire Company, 5 Cir. 1963, 313 F.2d 648; NLRB v. Southwire Company, 5 Cir. 1965, 352 F.2d 346; Southwire Company v. NLRB, 5 Cir. 1967, 383 F.2d 235; Southwire Company v. NLRB, 5 Cir. 1968, 393 F.2d 106.

ter's findings be adopted. We adopt the Master's findings.

The operative portions of this Court's decrees, upon which the present civil contempt proceeding is based, forbid the Company from discouraging membership by unlawfully discharging or discriminating against its employees; unlawfully interrogating its employees; and promising benefits to discourage union support. Succinctly the decrees prohibit the Company from further violation of 8(a) (1) and (3) of the Act.

In the spring of 1967, an organization drive was undertaken by two unions.[2] An election was held which the Unions lost. Alleged unfair labor practices occurred and this contempt proceeding followed.[3] The Master's findings of labor violations by the Company contrary to this Court's prior judgments are at issue.

## I.

### Judicial Notice

█ Southwire, an embattled and apparently embittered veteran of the union wars, vigorously complains that it was prejudiced by the Master's taking notice of prior proceedings involving Southwire. The Company contends that by taking judicial notice of its deepseated anti-union animus, the Master effectively altered the degree of proof required in a contempt proceeding; i. e. the evidence must be clear and convincing. Southwire suggests that by taking such notice, the Master made all credibility choices against the Company. The Company thus concludes that the Board's burden was reduced from producing clear and convincing evidence to merely that of substantial evidence.[4]

At a Pre-hearing Conference, attorneys for the Board requested the Special Master to take "official notice" of four cases in which this Court had affirmed Board findings of unfair labor practices by Southwire Company. The Company objected on the ground that such "Notice" would be a deprivation of their constitutional rights since there is a lesser degree of proof required in a Board hearing than in a contempt proceeding. The following colloquy occurred:

SPECIAL MASTER: '* * * your purpose in using respondents past actions as reflected in these cases is so that I can evaluate the *character of the company* * * * you want me to have that in the back of my mind as I listen to these witnesses and say, 'Well now, these are the *company's witnesses* and *they are not reliable* on particular evidence that is being given,' and throw that in the hopper to bring that up or down, if that is your purpose, and I believe that is what it is. As I listen to the testimony I would say, 'Well, don't give that too much weight because you have these two cases that say *they have been in trouble before*' * * *.''

The Special Master denied petitioner's request for official notice, stating:

"The doctrine of official notice should not be used to alter the degree of proof required in a contempt proceeding".

Despite this ruling the Company claims that the Master did *notice* the prior cases and as a result the Company was denied due process of law through use of a lower standard of proof.

The Special Master stated in his recommended findings of fact:

"It should be noted here that the unsuccessful efforts of unions to organize Southwire's employees in the past have resulted in prior proceed-

2. International Brotherhood of Electrical Workers, AFL-CIO and the International Union of Electrical, Radio and Machine Workers, AFL-CIO.

3. The Board made two separate contempt complaints which were consolidated before the Master and this Court because the

operative facts arose out of the same 1967 election.

4. In labor contempt proceedings, the evidence must be clear and convincing. NLRB v. Winn-Dixie Stores, 5 Cir. 1965, 353 F.2d 76; NLRB v. Tupelo Garment Co., 5 Cir. 1941, 122 F.2d 603.

ings in this Court. There can be no question that the Company possesses deepseated anti-union animus not only as recorded in prior proceedings of this Court, but as clearly demonstrated by its vigorous opposition to the 1967 Union organizing campaign as reflected in the printed matter distributed to its employees. The record of this proceeding as a whole leaves no doubt that the Company, its officers and its supervisory personnel are unalterably opposed to any unionization of Southwire." (Footnote and citations omitted)

■ The parties on brief vigorously argue the pros and cons of this issue as to whether judicial notice of prior proceedings is proper in a labor contempt case. Resolution of this question is not necessary in these proceedings and we pretermit discussion of the issue. Assuming that it is impermissible to take such notice we find that the Company has not suffered from application of a lower standard of proof. We find no indication that the Special Master relied on the prior proceedings in any substantial manner to find anti-union animus. Indeed the record read as a whole offers very nearly a text book model of union harassment techniques. We view the Master's language quoted above as a gratuitous observation. There was abundant proof of anti-union animus independent of the prior labor history and the prior decisions. We do not perceive that error was committed in this regard.

## II.

### *Surveillance*

In 1964, Southwire hired the Roman Security Agency Inc. to provide security services. Roman placed undercover agents in the plant who masqueraded as ordinary employees. The procedures employed by the agency displayed cloak and dagger techniques worthy of the C.I.A.

The agents recorded all normal company problems, such as timewaste and thefts in a regular report. Labor activities on the other hand were reported in two ways. One method was to submit written reports to the head agent who would transcribe such notes to a special report. The original notes were always destroyed. The special report was submitted to high company officials. The second method was to record in the regular report the code words "Nothing Special to Report Today". This language signified that a report on labor activities would be submitted orally and no record of the details would be made.

■■ The Company correctly states that not all surveillance is prohibited by the Act; that the only surveillance prohibited is that which interferes with, restrains or coerces union activities. The Company submits that the Master did not make a finding of interference, coercion, or restraint and the surveillance here was not violative of the Act. The Company also argues rather futilely that the purpose of the security program was not to spot theft, safety violations and inefficiency and hence that any ancillary or byproduct spying on union activities was *de minimus*. But the record convincingly shows that while union surveillance was not the sole or perhaps even the chief function of Roman, it was by no means *de minimus*.

■ The Company's basic argument is that since its undercover work was undetected the employees could not have felt coerced by the surveillance. It would be a surprising result if the law were such that an employer could engage in any devious spying technique it desired so long as the program was not detected by employees. Surreptitious surveillance has been disapproved as unlawful surveillance. Cf. NLRB v. Tidelands Marine Service, Inc., 5 Cir. 1964, 339 F.2d 291; Olson Rug Co. v. NLRB, 7 Cir. 1962, 304 F.2d 710, 714–715; NLRB v. Collins and Aikman Corp., 4 Cir. 1944, 146 F.2d 454, 455.

■ It is true that the Master made no specific finding that a specific employee's rights were interfered with, restrained, or coerced. However it is a reasonable inference that such informa-

tion received from its agents provided the Company with a knowledge of the union leaders' activities and facilitated the Company's subsequent harsh reprisals.

## III.

### Unlawful Solicitation

■ The Master found that the Company unlawfully solicited four employees, Griffin, Daniel, Mashburn and Cooley, to remove union badges. The Company concedes that as to Griffin and Cooley that there was a conflict in the evidence and thus room for opposing inferences to be drawn. As to Daniel and Mashburn, the Company merely makes the bald statement that the findings are not supported by clear and convincing evidence. The Company invokes no specific objection. A reading of the testimony before the Master reveals precisely to the contrary.

## IV.

### Interrogation

#### A. The Poll

On May 31, 1967, the Union filed a request with the NLRB to proceed with a representation election. On June 1, 1967, Southwire received a typical union authorization card majority recognition demand. On June 2, 1967, the Company engaged in a poll of its employees. In each instance, the Company official would read from a prepared text.[5]

■ The Company argues that the Master erred in finding that the poll was in violation of the Act because the Master improperly relied on Struksnes Construction Co., 165 NLRB No. 102 (1967). See N. L. R. B. v. J. M. Machinery Corp., 5 Cir. 1969, 410 F.2d 587, 589, n. 30. Struksnes sets out five requisites for a poll [6] one of which is a poll by

5. The text read:
"STATEMENT
"I have called this meeting today/tonight to discuss something which I consider to be as important to you as it is to Southwire.
"As you can see, I am reading from a prepared text instead of speaking to you off the cuff. The reason for this is to avoid any mistakes or confusion later on as to what I had to say to you here today/tonight.
"For several years, the I.U.E. has attempted to get into our plant. All of their efforts have failed. So now the National Labor Relations Board has announced that there will be another election here at Southwire on Friday, June 23rd.
"However, yesterday I received a letter from the lawyer for the union in which he claimed that the I.U.E. represented a majority of you, and he demanded that Southwire automatically recognize the union as your legal representative without ever giving you a chance to vote on this question in a secret-ballot election.
"Now, I personally doubt that this union actually does represent a majority of our employees as the union lawyer claims. However, as a result of this claim Southwire is presently confronted with this question: Do we (1) recognize this union now as your exclusive representative without an election: or do we (2) refuse to recognize the union and leave it up to you to decide this question in a secret-ballot election?
"I am going to put it to a vote of all the employees in this plant. However, before I ask for a show of hands from you, let me assure you that no employee will suffer any reprisals or other discrimination as a result of the way he or she votes here today. The sole purpose of this vote is to enable me to answer the union's demand intelligently.
"Now, at this time I ask all of you who want the union to be your representative without a secret-ballot election to hold up your hands. (Count Hands)
"Now, I ask all of you who are undecided and want the question settled by a secret-ballot election, and all of you who do not want a union here at Southwire to raise your hands. (Count Hands)
"Thank you very much".

6. Under Struksnes, an employer's poll of employees is considered unlawful, absent unusual circumstances, unless:
(1) The purpose of the poll is to determine the truth of a union's claim of majority status;
(2) The employees are told that this is the purpose of the poll;
(3) Assurances against reprisals are given;

secret ballot (admittedly not used in the present case). The Company argues that *Struksnes* was decided after the conducting of the poll here and should not have been applied to the present case.

 This Court need not become immersed in the morass of an of an argument as to retroactivity, assuming that the doctrine has applicability in labor contempt cases. The poll was clearly violative of even pre-*Struksnes* standards. The poll did not test the correctness of the union's majority claim. It was not designed to discover who favored the union and who opposed it, the basis of the majority claim. Rather the poll, conducted in a stark anti-union atmosphere, first merely sought a show of hands (connected to faces) of those who favored recognizing the union without an election. The unclear choice of the second alternative call for a show of hands is best demonstrated by recopying here for emphasis the language used, with numbers inserted to indicate the various categories called upon to vote in the same way at the same time:

> "Now, I ask all of you (1) who are undecided and (2) want the question settled by a secret-ballot election, and (3) all of you who do not want a union here at Southwire *to raise your hands.*"

In sum, the Master's finding that the poll constituted an unlawful interrogation is supported by clear and convincing evidence.

## V.

### *Wage Increase*

Southwire's position is that the wage increase resulted from months of study and planning and was unconnected with any anti-union motive. The increase was proposed to President Richards in November 1966, and was announced on May 5, 1967 and made effective on June 4, 1967 at the height of the organization campaign. Concededly, the increase was in part motivated by legitimate business reasons, but there is sufficient evidence to support the Master's findings that the timing of the raise was designed to achieve optimum anti-union results. The method followed in this instance deviated substantially from prior pay raise procedure.

In its message to the president, the pay raise committee recommended a pay hike of 25¢ per hour to be paid in five increments. The committee also suggested a change in shift hours and better communications between employees and management.

The president adopted the shift hour changes immediately and sat on the pay raise recommendation without action for more than six months. Finally it was decided in early May that the increase was to be 20¢ an hour (10¢ before the election and 10¢ after). The information was related to the foremen in mid-May and they in turn personally informed each of their employees. Normally pay raises were announced by placing the information on bulletin boards. The office employees who were not involved in the union campaign received only a 10¢ per hour increase in two 5¢ increments. Normally all employees received the same across the board increases. The increase was a flat uniform hourly rate instead of a percentage, as had been given in the past.

 The Special Master specially noted that although the wage increase decision was made on May 5, 1967, the announcement to the foremen was delayed until May 16, 1967 and because of the new procedure [7] of personal conveyance of information by the foremen the employees did not begin to learn of the increase until June 4, 1967. The crucial

(4) The employees are polled by secret ballot;

(5) The employer has not engaged in unfair labor practices or otherwise created a coercive atmosphere.

---

7. The Company attempted to justify this procedure on the basis that it helped promote labor-management relationship. The Master found this to be pretextual because the practice was abandoned in August 1967 soon after the election.

fact to evaluate "is not whether [the Company] would have increased wages at some time or another * * * but whether the increase was granted when it was, because of union activities". NLRB v. Laars Engineers Inc., 9 Cir. 1964, 332 F.2d 664, 667. There was an amplitude of clear and convincing evidence upon which the Master could reasonably conclude that the timing of the increase was union motivated.

### VI.

The remaining findings sought to be enforced by the Board deal with specific incidents involving specific individuals. Jurisprudence would not be served by prolonging this opinion by describing every incident. After careful review of the record we adopt the Master's findings that the Company threatened employees Tyree, Drummond and Martin; and the findings of discrimination against union activists North, Green, Kelley, Edna Griffin, Springer, Glendon Griffin and Brannon. Only the discharge of Mrs. Cato warrants discussion.

The Company knew that Mrs. Cato was the wife of a known union supporter. She was a trainee as a buncher machine operator.

Company witnesses testified that Mrs. Cato was continually visited by men from other departments, inattentive, careless, and generally uninterested in her work. As as result she was fired.

The Master noted that neither Cato nor the visiting men were issued warning slips for their conversations. The Master thought it curious that there was disparity in Company policy; another union advocate was fired for exchanging greetings with a fellow worker while Mrs. Cato's visitors were not even warned. Mrs. Cato never received any warning slips for shoddy workmanship. She was fired almost immediately after it became known that she was the wife

of a union supporter. Mrs. Cato was fired in violation of written Company policy of requiring an employee to have received four minor warnings before dismissal is justified.

While there is much to support the Company's position that the discharge was legitimate and was unconnected with union problems, we cannot say that the Master as finder of fact erred. The disparity in treatment of similar incidents, coincidence of the discharge with the Company's discovery of Mrs. Cato's marital relationship, and the contravention of established Company firing policy adequately support the Master's Findings.

### VII.

#### *The Board's Exceptions*

The Board argues that the Master's conclusions that Superintendent Ledford's and President Richards' statements were protected under Section 8(c) of the Act were erroneous as a matter of law.

Ledford advised the employees of possible bloodshed which *could* result from strikes and pickets. Richards informed the employees that if the Union came in he was unsure of the status of the Company, future raises, or of a profit sharing plan.

Section 8(c) of the Act implements the First Amendment by requiring that the expression of "any views, argument, or opinion" shall not be "evidence of an unfair labor practice" so long as such expression contains "no threat of reprisal or force or promise of benefit" in violation of Sec. 8(a) (1).

The Board urges that the Master's conclusions were erroneous as a matter of law in light of NLRB v. Gissel Packing Co., 395 U.S. 575, 618, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), which was decided shortly before the filing of the Master's Report.[8] A reading of *Gissel* reveals that the Supreme Court is merely reiterating the common rubric

---

8. The Board suggests that the Master may not have been aware of *Gissel* because *Gissel* was handed down on June 16, 1969

and the Master's Report was filed on July 9, 1969.

that an employer's predictions are protected by the First Amendment if they are based on fact and if such statements do not tend to coerce or offer benefits to the employees. Cf. N. L. R. B. v. Brownwood Mfg. Co., 5 Cir. 1966, 363 F.2d 136, 138; N. L. R. B. v. Transport Clearings, Inc., 5 Cir. 1963, 311 F.2d 519, 524. With deference to the Board, we do not agree with its suggestion that *Gissel* enunciated new law in this respect. Finally it should be noted that the Supreme Court in *Gissel* was reviewing determinations that certain employer statements were coercive while in the instant case we are reviewing an opposite result.

The relationship between predictions and fact and their possible impact upon employees is a question of fact and factual findings should not be overturned unless clearly erroneous (or if unsupported by substantial evidence in the normal NLRB case). We agree with the Master's findings that the statements in question were entitled to First Amendment protection.

The Court is grateful for the thorough report prepared by the Special Master, William K. Jackson, Esquire. His recommended findings of fact and conclusions of law are adopted in their entirety and

Enforced.

In conformity with this opinion and under the provisions of Rule 19, Federal Rules of Appellate Procedure, the Board is directed to serve upon the respondents, Southwire Company and Roy Richards, a proposed judgment and order conforming in all respects with the recommended conclusions and order set forth at pages 219–223 of the Report of the Special Master herein.

ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.